COMMISSIONER OF INTERNAL REVENUE *v.*
ENGLE ET UX.

No. 82–599.   Argued October 11, 1983—Decided January 10, 1984*

---

*Together with No. 82–774, *Farmar et al* v. *United States,* on certiorari
to the Court of Claims.

*Carter G. Phillips* argued the cause for petitioner in No. 82–599 and for the United States in No. 82–774. On the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Stuart A. Smith,* and *Jonathan S. Cohen.*

*Marvin K. Collie* argued the cause for petitioners in No. 82–774. With him on the brief were *William M. Linden* and *James A. Carter.*

*Thomas J. Donnelly* argued the cause for respondents in No. 82–599. With him on the brief was *Michael J. Conlan.*

JUSTICE O'CONNOR delivered the opinion of the Court.

These consolidated cases present the question whether §§ 611–613A of the Internal Revenue Code (Code), 26 U. S. C. §§ 611–613A, entitle taxpayers to an allowance for percentage depletion on lease bonus or advance royalty income received from lessees of their oil and gas mineral interests.

## I

### A

Ever since enacting the earliest income tax laws, Congress has subsidized the development of our Nation's natural resources. Toward this end, Congress has allowed holders of economic interests in mineral deposits, including oil and gas wells, to deduct from their taxable incomes the larger of two

depletion allowances: cost or percentage.[1]   Under cost depletion, taxpayers amortize the cost of their wells over their total productive lives.[2]   Under percentage depletion, taxpayers deduct a statutorily specified percentage of the "gross income" generated from the property, irrespective of actual costs incurred.[3]   Through these depletion provisions, Congress has permitted taxpayers to recover the investments they have made in mineral deposits and to generate additional capital for further exploration and production of the Nation's mineral resources.

Taxpayers have historically preferred the allowance for percentage, as opposed to cost, depletion on wells that are good producers because the tax benefits are significantly greater.   Prior to 1975, it was well settled that taxpayers leasing their interests in mineral deposits to others were entitled to percentage depletion on any bonus[4] or advance

---

[1] Originally, Congress authorized only a cost depletion allowance.   See 38 Stat. 172–173 (1913).   However, in the Revenue Act of 1918, it amended the Code to allow taxpayers to calculate depletion based on the discovery value of their mineral deposits.   See 40 Stat. 1067–1068.   When discovery value depletion proved difficult to administer, Congress eliminated it in favor of the percentage depletion allowance.   See 44 Stat. (part 2) 16 (1926).

For a detailed study of the history of percentage depletion, see Baker, The Nature of Depletable Income, 7 Tax L. Rev. 267 (1952).

[2] See 26 U. S. C. § 612.   The annual cost depletion deduction generally is calculated by multiplying the cost of the mineral interest by the ratio of the units sold in a taxable year to the total estimated recoverable reserves. See 26 CFR § 1.611–2(a) (1983).

[3] See 26 U. S. C. § 613.   Section 613(a) provides that "the allowance for depletion . . . shall be the percentage . . . of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)."

[4] A lease bonus is "the cash consideration paid by the lessee for the execution of an oil and gas lease by a landowner. . . . Bonus is usually figured on a per acre basis."   8 H. Williams & C. Meyers, Oil and Gas Law 65 (1982).

royalty[5] received, whether there was production of the underlying mineral or not. The bonus was regarded as "payment in advance for oil and gas to be extracted," *Herring* v. *Commissioner*, 293 U. S. 322, 324 (1934), and the advance royalty was considered a "return *pro tanto* of [the lessor's] capital investment in the oil in anticipation of its extraction . . . ." *Palmer* v. *Bender*, 287 U. S. 551, 559 (1933). Though the Commissioner of Internal Revenue had once argued that the allowance should not apply to such income,[6] this Court determined that both lease bonuses and advance royalties constituted "gross income from property" and accordingly were subject to percentage depletion. See *Herring* v. *Commissioner, supra,* at 327–328. The depletion was based on the income received from the property, and not, at least in the short run, on the production of the substance itself. 293 U. S., at 327–328.

Even under pre-1975 law, however, depletion deductions eventually had to be attributed to actual production. Lessors receiving bonus or advance royalty income without oil or gas being produced during the life of the lease have been required to recapture their depletion deductions and restore the previously deducted amounts to income. See *Douglas* v. *Commissioner*, 322 U. S. 275, 285 (1944). Furthermore,

---

[5] An advance royalty is simply a prepayment of the landowner's share of production, in kind or in value, free of the expenses of production. *Id.*, at 656–657.

[6] The Commissioner interpreted the pertinent section of the 1926 Code, which provided an allowance for percentage depletion only "[i]n the case of oil and gas wells," see 44 Stat. (part 2) 16, not to entitle taxpayers to percentage depletion in situations where no such well existed. Since a well does not technically exist prior to actual production, the Commissioner contended that the percentage depletion provision did not apply to lease bonus or advance royalty income, which by definition precedes production. The Commissioner would have allowed percentage depletion only if *future* production were practically assured, or in fact obtained, during the taxable year. See G. C. M. 11384, XII–1 Cum. Bull. 64 (1933), revoked by G. C. M. 14448, XIV–1 Cum. Bull. 98 (1935).

since only one percentage depletion allowance is statutorily authorized for each dollar of oil and gas income, lessees have always been required to reduce their allowances by any bonuses or advance royalties paid to lessors. See *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312 (1934). Thus, prior to 1975, those who held economic interests in mineral deposits, large or small, were entitled to a single percentage depletion deduction for *all* income from the property, including lease bonus and advance royalty income, so long as oil or gas was eventually extracted from the land.

The 1970's, however, brought about an abrupt redirection in the Nation's energy policy. Escalating energy prices and the Arab oil embargo awakened the public to the Nation's growing reliance on foreign energy sources. Some thought the major integrated oil companies were reaping excessive oil and gas profits at the public's expense, while reinvesting little of their concomitant tax depletion subsidies in domestic energy production.[7] Congress responded to this public outcry by repealing the percentage depletion allowance as applied to the major integrated oil companies. See Tax Reduction Act of 1975, Pub. L. 94–12, 89 Stat. 26, 47–53. At the same time, however, it exempted independent producers and royalty owners from the repeal to encourage domestic production. In new § 613A, Congress provided that

> ". . . the allowance for depletion under section 611 shall be computed in accordance with section 613 with respect to—
>
> "(A) so much of the taxpayer's average daily production of domestic crude oil as does not exceed the taxpayer's depletable oil quantity; and

---

[7] See, *e. g.*, 121 Cong. Rec. 7239–7244 (1975) (statement of Sen. Hollings); *id.*, at 7244–7248 (statement of Sen. Ribicoff); *id.*, at 7267 (statement of Sen. Cranston); see generally Landis, The Impact of the Income Tax Laws on the Energy Crisis: Oil and Congress Don't Mix, 64 Calif. L. Rev. 1040, 1042–1048 (1976).

"(B) so much of the taxpayer's average daily production of domestic natural gas as does not exceed the taxpayer's depletable natural gas quantity;

"and the applicable percentage (determined in accordance with the table contained in paragraph (5)) shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of that section." 26 U. S. C. § 613A(c)(1).[8]

Thus, beginning with tax year 1975, only taxpayers who met the terms of this new provision were eligible for the percentage depletion allowance.[9]

## B

During 1975, Fred Engle and his wife assigned their two Wyoming oil and gas leases to third parties, retaining overriding royalties in each lease. As partial consideration for these assignments, the Engles received a total of $7,600 in advance royalties. This $7,600 constituted the entire income the Engles received from the property in 1975 since there was no oil and gas production that year. On their joint federal income tax return for 1975, the Engles claimed a percentage depletion deduction equal to 22% of the advance royalties received. The Commissioner disallowed the deduction because the advance royalties were not received "with respect to" any "average daily production" of oil or gas as, in his view, was required by the 1975 amendments to the Code.

The Tax Court, with one judge dissenting, upheld the Commissioner's determination. 76 T. C. 915 (1981). It agreed that new § 613A tied the oil and gas percentage

---

[8] Congress defined the taxpayer's "average daily production" of oil or gas to be the aggregate production from the property during the taxable year divided by the number of days in the taxable year. See 26 U. S. C. § 613A(c)(2)(A).

[9] In other paragraphs of new § 613A, Congress designated certain gradually decreasing rates and depletable quantities that independent producers and royalty owners are to use in calculating their allowances. See 26 U. S. C. §§ 613A(c)(3), (5).

depletion allowance to actual production and that the Engles' advance royalty receipts were not attributable to such production.[10] But the Court of Appeals for the Seventh Circuit reversed. 677 F. 2d 594 (1982). It found that Congress' motivation in retaining the percentage depletion allowance for "small producers"—namely, to subsidize domestic energy development—was equally applicable to advance royalties received by lessors. *Id.*, at 600. The Court of Appeals therefore held that, in light of this motivation and the Code's longstanding treatment of advance royalties, new § 613A should be interpreted to authorize a percentage depletion allowance on advance royalties received, so long as there eventually was production from the property. *Id.*, at 601–602.

Also during 1975, the families of Philip D. Farmar and A. A. Sugg, joint owners of 46,515 acres of land in Irion County, Tex., leased their oil and gas interests to various lessees. Under the leases, the Farmars and Suggs were to receive as royalties 20% of all oil and gas produced and sold from the property or 20% of the value of all oil and gas produced from the leases. The leases also provided that the Farmars and Suggs were to receive annual cash bonuses, beginning with a small sum in 1975 and continuing with large sums through 1979, over the life of the lease. These bonuses were payable even if no oil or gas was produced from the property. In 1976, oil and gas was discovered on the Irion property and was produced in substantial amounts. The Farmars and Suggs claimed percentage depletion deductions on both the bonuses and royalties received in that year. The Commissioner disallowed the percentage depletion deductions on the lease bonuses, again because income of this type was not received "with respect to" any "average daily production."

---

[10] In a separate determination, the Tax Court held that lease bonuses, like advance royalties, were not subject to the allowance for percentage depletion. See *Glass v. Commissioner*, 76 T. C. 949 (1981).

After paying the resulting deficiencies, the Farmars and Suggs filed a consolidated suit for refund in the Court of Claims. The Court of Claims held for the Commissioner. 231 Ct. Cl. 642, 689 F. 2d 1017 (1982). It concluded that "[t]his statutory language regularly linking depletion directly to production during a taxable year indicates to us that Congress wanted depletion allowable only 'with respect to' income derived from, or connected with, actual extraction during the taxable year." *Id.*, at 649, 689 F. 2d, at 1021. Since lease bonus income was not so attributable, the court determined that the Farmars and Suggs were not entitled to a percentage depletion allowance on it. See *id.*, at 656–657, 689 F. 2d, at 1025.

The Commissioner sought a writ of certiorari from the adverse decision of the Court of Appeals for the Seventh Circuit, and the Farmars and Suggs sought a writ of certiorari from the adverse decision of the Court of Claims. We granted both writs, 459 U. S. 1102 (1983), and consolidated the cases so that we could decide the effect the Tax Reduction Act of 1975 had on percentage depletion of oil and gas income.

## II

The 1975 amendments to the Code did not repeal any of the provisions that previously entitled taxpayers to an allowance for percentage depletion on lease bonus or advance royalty income arising from oil and gas mineral interests. Rather, the 1975 amendments added new § 613A, which, as its title indicates, is a "Limitatio[n] on percentage depletion in case of oil and gas wells." Our sole task in this case is to determine whether Congress, in enacting the § 613A "limitation," intended to deny the allowance for percentage depletion on advance royalty or lease bonus income altogether.

## A

Our starting point, of course, is the language of the statute itself. That language authorizes any independent producer

or royalty owner not otherwise disqualified, see 26 U. S. C. § 613A(d), to compute "the allowance for depletion under section 611 . . . in accordance with" § 613's "gross income from . . . property" concept. 26 U. S. C. § 613A(c)(1). That language also stipulates that the allowance be "with respect to . . . so much of the taxpayer's average daily production . . . as does not exceed the taxpayer's depletable . . . quantity . . . ." *Ibid.* The Commissioner and the taxpayers take different positions as to what this language means.

The Commissioner contends that new § 613A finally adopts the position he took a half century ago in the *Herring* case— namely, that taxpayers are not entitled to percentage depletion on any income not attributable to specific units of production during the taxable year.[11] He points to § 613A(c)(1)'s requirement that "the allowance . . . be computed . . . with respect to . . . the taxpayer's average daily production" and to the repeated references in §§ 613A(c)(2) through (10) to "aggregate production," "production during the taxable year," and "production during the calendar year." From these statutory reference points, the Commissioner contends that § 613A redefines depletable "gross income from . . . property" to be that income attributable to specific units of production during the taxable year.[12] Since lease bonuses and advance royalties are not attributable to *specific* production during any taxable year, the Commissioner concludes that Congress did not intend such receipts to be eligible for per-

---

[11] The Commissioner's view is embodied in proposed regulations. See 42 Fed. Reg. 24279 *et seq.* (1977).

[12] Interestingly enough, the Commissioner does not believe that the language should be literally interpreted in all circumstances. Although he interprets the statute to deny the allowance for percentage depletion on income received prior to production, see *id.*, at 24287 (proposed 26 CFR § 1.613A–7(f)(1)), he interprets it to permit the allowance when the situation is reversed—when extraction occurs in a taxable year prior to the year in which income is received. 42 Fed. Reg., at 24281 (proposed 26 CFR § 1.613A–3(a)(4)(7)).

centage, as opposed to cost, depletion. See Brief for Commissioner 18–24.

The taxpayers, by contrast, suggest that Congress did not intend, by enacting new § 613A, to change the tax treatment of lease bonus or advance royalty income at all. Rather, they contend that the percentage depletion allowance is available regardless of whether physical extraction occurred during the year for which the deduction is claimed. Under their view, the reference to "average daily production" in § 613A constitutes a limitation on the amount of, rather than a prerequisite to, the deduction a taxpayer may claim. Furthermore, the requirement that the allowance be "with respect to" production is simply the pre-1975 recapture requirement reenacted: depletion deductions must always "be with respect to" actual or prospective extraction. Since lease bonus and advance royalty receipts are income arising from the property, the taxpayers conclude that they are eligible for percentage depletion so long as they do not exceed the § 613A limitation and production eventually occurs on the property. See Brief for Respondents in No. 82–599, pp. 5–9; Brief for Petitioners in No. 82–774, pp. 7–16.

The Commissioner's and taxpayers' interpretations do not exhaust the possible readings of this linguistic maze. For example, § 613A could also be read to change the *timing*, though not the availability, of the percentage depletion allowance.[13] Under this view, all income arising from the property would potentially be subject to an eventual allowance for depletion, but the actual deduction would be deferred to a year in which it could be attributed, by some allocation

---

[13] See Jones, Analysis of CA–7 *Engle* Decision Allowing Percentage Depletion Absent Abstraction, 57 J. Taxation 230, 233 (1982); Bravenec, Continued Availability of Percentage Depletion on Oil and Gas, 23 Oil and Gas Tax Q. 204, 211–214 (1975); Note, Percentage Depletion on Oil and Gas Lease Bonuses and Advance Royalties: Engle v. Commissioner, Glass v. Commissioner, and Farmar v. United States Reviewed, 35 Baylor L. Rev. 97, 120–121 (1983).

method, to actual production. Since lease bonus and advance royalty income always precede production, they would be included in taxable income during the year of receipt. The depletion allowance attributable to such receipts, however, would be capitalized and amortized against income in years of actual extraction, subject to the rates and depletable quantities limitations applicable in those subsequent years.[14]

Each of these possible interpretations of new § 613A can be reconciled with the language of the statute itself. Congress' repeated references to "production" during the "taxable year" could not have been completely inadvertent, but each of the possible interpretations gives meaning to those references. Our duty then is "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *NLRB* v. *Lion Oil Co.*, 352 U. S. 282, 297 (1957) (Frankfurter, J., concurring in part and dissenting in part). The circumstances of the enactment of particular legislation may be particularly relevant to this inquiry, *Watt* v. *Alaska*, 451 U. S. 259, 266 (1981), and it is to those circumstances that we now turn.

## B

The 1975 amendments to the Code responded both to the public outcry concerning the country's growing dependence on foreign energy and to the alleged excessive profits that major integrated oil companies were earning. Congress wanted to encourage domestic production[15] and to improve

---

[14] See n. 13, *supra*.

[15] The House and Senate debates of the 1975 Congress are replete with references to the Nation's domestic oil and gas shortage. See, *e. g.*, 121 Cong. Rec. 4606 (1975) (remarks of Rep. Rhodes) ("I think we should all recall that one of the reasons for this bill being brought here with some haste is the fact that we have a shortage of domestic petroleum"); *id.*, at 7807 (remarks of Sen. Curtis) ("Our first objective should be the production of more gas and oil"); *ibid.* (remarks of Sen. Bartlett) ("I think it is important that we face up to the American people and say that this body has

the competitive position of "small producers"—the independents and the royalty owners—vis-à-vis the major integrated ones.[16] Section 613A's goal, more simply put, was to subsidize the combined efforts of small producers and royalty owners in the exploration and production of the Nation's oil and gas resources. Any reasonable interpretation of the statute, therefore, must harmonize with this goal.

If the Commissioner's interpretation were adopted, taxpayers would receive percentage depletion on income derived from oil and gas interests only if the payment associated with that income could be attributed directly to specific units of production. On that view, lessors and lessees interested in favorable tax benefits will not use financing arrangements that provide for prepayments on production, that spread income to nonproduction periods or, more importantly, that shift the risks of nonproduction to the parties better able to bear them.[17] Lessors naturally will begin demanding larger

---

done next to nothing to increase the production of natural sources of energy in this country . . ."); *id.*, at 8128 (remarks of Sen. Dole) ("The 2,000 barrel . . . exemption from the depletion allowance repeal is vitally important to maintaining a high level of energy exploration and production"); *id.*, at 8944 (remarks of Rep. Pickle) ("In this time of national energy crisis, what we need—desperately—is more production").

[16] Members of Congress repeatedly emphasized that their efforts were aimed at the major integrated oil companies, and not the small producers. See, *e. g.*, *id.*, at 4610 (remarks of Rep. Cotter) ("[I]t will serve notice on the major oil companies that this new Congress will not be subservient to their unreasonable demands . . ."); *id.*, at 8865 (remarks of Sen. Hollings) ("Although as much as 85 percent of the oil production is now ineligible for the depletion allowance . . . as many as 98 percent of the oil producers in this country will still retain [percentage] depletion").

[17] Lease bonuses generally are not refundable to lessees even if no oil or gas is produced from the property. See *Shamrock Oil & Gas Corp. v. Commissioner*, 35 T. C. 979, 1057 (1961). Smaller risk-averse lessors, therefore, are likely to prefer these sums certain to uncertain sums, like advance royalties or royalty streams, that either may not materialize or may have to be returned. Cf. 121 Cong. Rec. 4641 (1975) (remarks of Rep. de la Garza) ("We are only hurting the little people" by repealing the percentage depletion deduction for royalty owners). Conversely, lessees

production royalties to offset the increased expense resulting from delayed receipt of payments, income bunching, and risk bearing. Lessees who are forced to pay the increased royalties will, in turn, have less money with which to purchase leases or to extract minerals therefrom. Thus, solely for tax reasons, lessors and lessees will choose less preferred forms of financing their exploration and production efforts and, in the long run, devote fewer dollars to development of the Nation's energy reserves. In short, the Commissioner's interpretation anomalously suggests that a Congress intent on increasing domestic production by small producers included substantial economic disincentives in the same enabling legislation. Such an interpretation does not comport with Congress' effort to increase production by the independent producers and royalty owners. By contrast, allowing percentage depletion on all qualified income arising from the property makes available the maximum public subsidy that Congress was willing to provide.

Ironically, the Commissioner defends his interpretation by reference to the oil and gas crisis that existed in 1975. See Reply Brief for Commissioner 7. He argues that if lessors are allowed percentage depletion only on income directly attributable to production, they will have strong incentives to encourage lessees to produce oil and gas immediately from the property. No one disputes this premise. Requiring lessors to *defer* percentage depletion deductions to years of actual production would indeed optimize the incentives for early production of the property. But the Commissioner has not suggested that the percentage depletion deductions on

---

prefer to condition their advance payments on eventual production. See 3 H. Williams, Oil and Gas Law § 666, pp. 793–795 (1981). But since lessees can spread their risks over many leased properties, they predictably will be willing to pay nonrefundable lease bonuses in exchange for reduced prices on the overall lease arrangements. By pooling risks in this fashion, lessors and lessees, like insurers and their insureds, optimize the allocation of resources in the production of oil and gas from the property. See generally K. Arrow, Essays in the Theory of Risk Bearing 134–143 (1971).

advance royalties and lease bonuses be *deferred* to years of actual production; he argues that they be *eliminated* altogether. Eliminating the percentage depletion deductions, rather than deferring them, will reduce the total amount of "gross income" subject to the percentage depletion allowance and thereby shrink the public subsidy of domestic oil and gas production. Smaller public subsidies, in turn, mean reduced exploration and production incentives and smaller absolute quantities of domestic production. Thus, the Commissioner's initial premise—that Congress wanted to encourage domestic exploration and production—is against the general position he has taken with respect to lease bonus and advance royalty income.

## C

The reasonableness of each possible interpretation of the statute can also be measured against the legislative process by which § 613A was enacted. When the 1975 amendments were introduced, neither the bill, H. R. 2166, 94th Cong., 1st Sess. (1975), nor the accompanying Ways and Means Committee Report, see H. Rep. No. 94–19 (1975), provided for repeal of the percentage depletion allowance on oil and gas wells. Rather, the provision repealing the percentage depletion allowance was introduced only during debate on the House floor. See 121 Cong. Rec. 4651–4652 (1975). This floor amendment did not contain any of the exemptions ultimately enacted as part of § 613A, including the exemption for independent producers and royalty owners. It was only when H. R. 2166 reached the Senate floor that the exemption for independent producers and royalty owners was added. See *id.*, at 7813. The Congress then enacted H. R. 2166, with slight alteration by the Conference Committee, as it was amended on the Senate floor.

At no time during either the Senate's or the Conference Committee's consideration of H. R. 2166 was a repeal of the percentage depletion allowance on lease bonus or advance royalty income suggested. Rather, both the Senate and the

conferees agreed to maintain the percentage depletion allowance, in its entirety, for those small producers and royalty owners whose income from the property did not exceed that associated with the yearly depletable quantities.[18] As explained by the Conference Report, the proposed legislation

> "*retains* percentage depletion at 22 percent on a permanent basis for the small independent producer to the extent that his average daily production of oil *does not exceed* 2,000 barrels a day, or his average daily production of gas *does not exceed* 12,000,000 cubic feet. Where the independent producer has both oil and natural gas production, the *exemption* must be allocated between two types of production.

> .        .        .        .

> ". . . The conference substitute follows the Senate amendment in providing a small producer *exemption* from the repeal of percentage depletion for oil and gas." H. R. Conf. Rep. No. 94–120, pp. 67–68 (1975) (emphasis added).

Thus, in exempting independent producers and royalty owners from the repeal, the Senate and the Conference Committee expressed a clear intent to *retain* the percentage depletion rules as they then existed. Again, the congressional intent is more in harmony with interpretations of the statute

---

[18] Thus, Senator Bentsen, who introduced one of the amendments to H. R. 2166, see 121 Cong. Rec. 7277 (1975), stated that the depletable figures were chosen "as a definition of a small producer . . . ." Hearings on H. R. 2166 before the Subcommittee on Energy of the Senate Committee on Finance, 94th Cong., 1st Sess., 2 (1975); see also 121 Cong. Rec. 7777 (1975). Similarly, Senator Dole stated that the 2,000-barrel figure "identif[ied] the particular importance of independent producers." *Id.*, at 8128. Senator Dole believed that the "exemption from the depletion allowance repeal [would] permit most of these small producers to remain in production, giving us the additional oil and gas that we so greatly need . . . . It will also encourage most of the independents who do the vast bulk of exploration in this country to continue their drilling programs." *Ibid.*

that retain percentage depletion on all forms of income than with the Commissioner's interpretation.

The Commissioner attempts to find legislative support for his interpretation not in the history of the enacting Congress, but in the history of a previous Congress. In H. R. 17488, 93d Cong., 2d Sess. (1974), the House proposed to repeal the percentage depletion allowance for oil and gas production and, at the same time, to exempt certain independent producers from the repeal. The House Ways and Means Committee Report on H. R. 17488 emphasized that "a lease bonus paid to the lessor of mineral lands in a lump sum or in installments is independent of any actual production from the lease and thus would not be within any of the exemptions." H. R. Rep. No. 93–1502, p. 46 (1974). The Commissioner suggests that "'[t]he idea of a special exemption for small entities, expressly involving production, was very much in the air of the 94th Congress, and it is not unlikely that the prior report was known to several, if not many, of the members who considered § 613A,' and almost certainly to those who proposed that Section 613A be added to the tax reduction bill." Reply Brief for Commissioner 6 (quoting 231 Ct. Cl., at 654, 689 F. 2d, at 1024).

In the 94th Congress, however, the House Ways and Means Committee reported out another bill, H. R. 2166, in lieu of H. R. 17488. This bill retained the percentage depletion allowance and differed from H. R. 17488 in many other respects. See 121 Cong. Rec. 4651–4652 (1975). Thus, it cannot be said that a subsequent Congress, or even the House Ways and Means Committee itself,[19] retained the

---

[19] In the 93d Congress, 25 Representatives, including Chairman Wilbur Mills, served on the Ways and Means Committee. 95th Congress Legislative Record of the Committee on Ways and Means, 95th Cong., 2d Sess. 359 (Comm. Print 1979) (listing Committee membership). In the 94th Congress, the Committee grew to 37 members, was chaired by Representative Al Ullman, and had 18 new members. Id., at 360. Thus, not only is it difficult to believe the Committees of the 93d and 94th Congresses had

same intent as reflected in H. R. 17488. Moreover, since it was the Senate, and not the House, that added the small-producer exemption to H. R. 2166,[20] we must dismiss the Commissioner's reconstruction of the legislative intent as mere wishful thinking. The idea of an exemption for small producers was certainly in the "air" of the 94th Congress, but we find no evidence that a change in the definition of depletable "gross income" was aloft with it.[21]

D

We have noted that "[t]he true meaning of a single section of a statute in a setting as complex as that of the revenue acts, however precise its language, cannot be ascertained if it be considered apart from related sections, or if the mind be isolated from the history of the income tax legislation of which it is an integral part." *Helvering* v. *Morgan's, Inc.*, 293 U. S. 121, 126 (1934). When the Commissioner's, the taxpayers', and the commentators' interpretations of § 613A are viewed in these terms, it becomes clear to us that Congress did not mean, as the Commissioner's interpretation suggests, to withdraw the percentage depletion allowance on

the same intent, it is also hard to characterize them as being the same Committee.

[20] The Senate amendment differed from the exemption contained in H. R. 17488 in still other respects. For example, the Senate amendment allowed percentage depletion at a rate of 22% and with respect to 2,000 barrels of average daily production. H. R. 17488, by contrast, provided for percentage depletion at the rate of 15% with respect to the first 3,000 barrels of production per day.

[21] The Commissioner also points to deliberations in subsequent sessions of Congress, that never culminated in legislation, to support his position. See Brief for Commissioner 30–32. We find this particular history to be ambiguous at best: Postenactment interpretive material of this type is a "hazardous basis for inferring the meaning of a congressional enactment." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 118, and n. 13 (1980); see also *Southeastern Community College* v. *Davis*, 442 U. S. 397, 411, and n. 11 (1979).

lease bonus or advance royalty income arising from oil and gas properties.

The 1975 Congress was concerned with shrinking domestic production levels and with assisting smaller producers to compete with the larger ones. Since most depletion deductions are on royalty payments attributable to actual production, Congress, in its haste, not surprisingly defined the class of taxpayers exempted from the percentage depletion repeal in terms of certain production levels. Section 613A clearly provides that income attributable to production *over* a certain level will not be eligible for percentage depletion. But nothing in the statute bars percentage depletion on income received prior to actual production. To the contrary, we agree that so long as the income can, by some allocation method, be attributed to production below the ceilings Congress established, lease bonus and advance royalty income come within the four corners of the percentage depletion provisions. Lease bonuses and advance royalties are payments received in advance for oil and gas to be extracted, see *Herring* v. *Commissioner*, 293 U. S. 322 (1934), and therefore should be subject to the §613(a) computation of, and §611 allowance for, oil and gas depletion.

## III

Unable to find persuasive support for his position in the text, general purpose, or specific history of the Tax Reduction Act of 1975, the Commissioner reminds us both that the "choice among reasonable interpretations is for the Commissioner, not the courts," *National Muffler Dealers Assn., Inc.* v. *United States*, 440 U. S. 472, 488 (1979), and that his choice, if found to "implement the congressional mandate in some reasonable manner," must be upheld. *United States* v. *Correll*, 389 U. S. 299, 307 (1967). "But that principle [only sets] the framework for judicial analysis; it does not displace it. We find that the [Commissioner's interpretation] is . . . unreasonable," and we therefore cannot defer to it. *United*

*States* v. *Cartwright*, 411 U. S. 546, 550 (1973) (similarly refusing to defer to unreasonable position of Commissioner).

Holders of economic interests in oil and gas deposits have consistently been entitled to a percentage depletion allowance on *all* income arising from their property, including lease bonuses and advance royalties, for the past 50 years. See *Herring* v. *Commissioner, supra.* Our cases have taken a longrun view of the relation between income and production, and we have interpreted the Code to allow percentage depletion on all income so long as actual extraction eventually occurs. See *Douglas* v. *Commissioner*, 322 U. S. 275 (1944). We usually presume that "Congress is . . . aware of [our longstanding] interpretation of a statute and adopt[s] that interpretation when it re-enacts [the] statute without [explicit] change . . . ." *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978); see also *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 414, n. 8 (1975). Had Congress meant to eliminate the percentage depletion allowance on lease bonus and advance royalty income, we believe it would have addressed our decisions to the contrary more explicitly. See *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 289 (1956). Since Congress did not, we find the Commissioner's shortrun view of the relation between income and production to be at odds with the amended statutory scheme.

The percentage depletion provisions, as modified in 1975, plainly were intended to encourage independent producers and royalty owners to explore and develop the Nation's domestic oil and gas deposits. See *supra*, at 217–218. Yet the Commissioner would discourage these small producers from using the financing arrangements that would optimize their combined efforts to produce oil and gas. See *supra*, at 218–220. Not only would the Commissioner deny lessors percentage depletion on lease bonus and advance royalty income, but he also would continue to require lessees to reduce their depletion allowances by the amounts lessors *would* have been allowed, under pre-1975 law, to deplete. See Rev. Rul.

81–266, 1981–2 Cum. Bull. 139. The Commissioner would allow *no one* to take the single allowance that the statute clearly contemplates *someone* should take. See 26 U. S. C. §§ 611(b)(1), 613(a). Thus, the Commissioner not only skews the industry's preferred means of financing oil and gas exploration, but he unreasonably denies that industry a subsidy Congress expressly contemplated it should receive.[22] Such an interpretation is "unrealistic and unreasonable," and therefore is not entitled to deference. *United States* v. *Cartwright, supra,* at 550.

Finally, the Commissioner has not persuaded us of any "insurmountable" practical problems that would render his position more tenable. We do not doubt that § 613A's various production requirements and limitations make accurate calculation of the percentage depletion allowance difficult in the absence of actual production figures. See 76 T. C., at 926. But we believe the Commissioner can resolve these problems in a number of reasonable ways, for example, by requiring lessors to defer depletion deductions to years of actual production or by requiring lessors to adjust deductions taken with amended returns filed in later tax years.[23] The Com-

---

[22] In *Helvering* v. *Twin Bell Oil Syndicate,* 293 U. S. 312 (1934), this Court interpreted § 613(a) to allow the Commissioner to require lessees, for purposes of computing percentage depletion, to reduce their gross incomes by the advance payments made to lessors. Congress later codified this rule in § 611(b), 26 U. S. C. § 611(b), which requires that the deduction for depletion be equitably apportioned between lessor and lessee. The Commissioner has implemented § 611(b) by requiring lessees to capitalize the lease bonus or advance royalty payments made and to amortize those capitalized costs over the productive life of the well. See 26 CFR § 1.1613–2(c)(5) (1983). The very fact that §§ 611(b) and 613(a) were left intact by the 1975 amendments is itself some indication that Congress did not intend to deny the depletion benefit on advance payments to lessors. See Note, 35 Baylor L. Rev., at 120–121.

[23] See Jones, 57 J. Taxation, at 233; Note, 35 Baylor L. Rev., at 122. The Commissioner currently requires much the same treatment from lessees. See n. 22, *supra.*

missioner has broad authority to prescribe all "needful rules and regulations" for the enforcement of the tax laws, see 26 U. S. C. § 7805(a), and it is up to him to choose the method that best implements the statutory mandate. See *United States* v. *Correll*, 389 U. S., at 306–307. What the Commissioner cannot do—because it is an "unreasonable" interpretation of the statutory language in light of its history and purpose—is to resolve the practical problems by eliminating the allowance altogether. Eliminating the allowance might make the statute "simpler to administer," Reply Brief for Commissioner 9, and n. 8, but it does so by ignoring the language of the statute, the views of those who sought its enactment, and the purpose they articulated.

## IV

In cases such as these, where the effective and expeditious enforcement of our Nation's tax laws is at issue, what we do not decide is as important as what we do decide. These cases do not concern whether taxpayers must include bonuses and advance royalties in their income in the year of receipt. No one questions that taxpayers must do that. See *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417 (1932). Nor do these cases concern the appropriate tax period in which the percentage depletion deduction should be used to offset taxable income. That issue is a significant one, but none of the parties has directly raised it for our review. Cf. 26 CFR § 1.461–1 (1983) (assets having useful life beyond close of year not necessarily deductible in year expenditure made). Rather, our decision holds only that §§ 611–613A of the Code entitle taxpayers to an allowance for percentage depletion on lease bonus or advance royalty income at some time during the productive life of the lease.

Accordingly, since the Commissioner has never contested the tax period in which the Engles claimed their percentage depletion deduction, the judgment of the Court of Appeals

for the Seventh Circuit in No. 82–599 is affirmed.[24]   The judgment of the Court of Claims in No. 82–774 denying the Farmars and Suggs any percentage depletion on their lease bonus income is reversed, and the case is remanded for further proceedings in conformity with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE WHITE, and JUSTICE MARSHALL join, dissenting.

The Court's decision today is a troubling one, perhaps less for where the Court has ended up than for how it arrived there.   Under the principles that traditionally have governed this Court's approach to statutory interpretation in the field of federal tax law, the Commissioner's administrative interpretation is entitled to prevail so long as it is not "'unreasonable and plainly inconsistent with the revenue statutes.'" *Bingler* v. *Johnson*, 394 U. S. 741, 749–750 (1969), quoting *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496, 501 (1948); accord, *Thor Power Tool Co.* v. *Commissioner*, 439 U. S. 522, 533, n. 11 (1979); *Fulman* v. *United States*, 434 U. S. 528, 533 (1978).   While the Court professes to adhere to this rule today, *ante*, at 224–225, a review of the Court's reasoning suggests that the Court has chosen to honor the rule in the breach.   Because I regard the Commissioner's interpretation as consistent with the language of the controlling statute, its legislative history, and the policies underlying § 613A of the 1954 Code, 26 U. S. C. § 613A, and because his interpretation surely is as reasonable in these respects as the rival interpretations advanced by the taxpayers and the Court, I must dissent.

## I

The Court concedes that interpreting § 613A to disallow percentage depletion for advance royalties and lease bonuses

---

[24] We express no opinion concerning whether the Commissioner is precluded from raising this issue in another proceeding.

is compatible with the language of the statute. *Ante,* at 215–217. I am less sanguine than the Court about how easily § 613A can be read to accommodate the depletion rule of *Herring* v. *Commissioner,* 293 U. S. 322 (1934). Section 613A(c)(1) requires that percentage depletion be calculated with respect to "average daily production," which in turn is defined in terms of "aggregate production of domestic crude oil or natural gas . . . *during the taxable year.*" § 613A(c)(2) (emphasis added). "Taxable year" is defined by § 7701(23) to mean the calendar or fiscal year "upon the basis of which the taxable income is computed under subtitle A." When a taxpayer claims percentage depletion for advance royalties or lease bonuses in a calendar or fiscal year in which no oil or gas is produced, he necessarily asks that "taxable year" be given a meaning in § 613A(c) different from the one assigned to it by § 7701(23), because the "taxable year" defined by § 7701(23) is one during which no "aggregate production," and hence no "average daily production," has occurred. In any event, the depletion rule sought by the taxpayers in these cases certainly does not fit the language of § 613A so closely that the Commissioner's interpretation becomes unreasonable on textual grounds.

The *Herring* rule also produces what the Court itself characterizes as difficult practical problems under § 613A(c). Because the depletion limitations contained in § 613A(c) are couched in terms of quantities of output, a taxpayer who claims percentage depletion on advance royalties or lease bonuses before production has occurred cannot possibly establish *ex ante* how many barrels of oil or cubic feet of gas his advance payment represents. The problem is exacerbated by the fact that the limitations of § 613A(c) vary depending on the type of fuel produced and the nature of the extraction process, factors that often cannot be known before production begins. See §§ 613A(c)(4) and (6). A review of the academic literature, see *ante,* at 216–217, and n. 13, appears to have convinced the Court that these problems can be over-

come by deferring the depletion allowance for advance royalties and lease bonuses to years in which the allowance can be attributed "by some allocation" to actual production. This timing theory, however, has its own practical problems. In particular, it is unclear how the taxpayer is to apply the income limitations of § 613(a) and § 613A(d)(1), under which the depletion allowance is limited to 50 percent of the taxpayer's taxable income from the property and 65 percent of his overall taxable income, when the income that gives rise to the allowance is recognized in one year and the allowance itself is taken in one or more subsequent years.[1]

The Court's assertion that the Commissioner can resolve the problems caused by retention of percentage depletion for advance royalties and lease bonuses "in a number of reasonable ways," *ante*, at 226–227, stands the normal rationale for judicial deference to administrative interpretations of the tax laws on its head. One reason for that deference is that the Commissioner is better able than any court, including this one, to assess the practical consequences of particular interpretations and to resolve statutory ambiguities in ways that minimize administrative difficulties. Rather than give due regard to this expertise in the first instance in construing § 613A, the Court has embraced an interpretation whose practical complications the Court itself recognizes and has left the Commissioner to bring order to the confusion that the Court now has created. Ockham's razor is nowhere in evidence.

---

[1] In his dissent (favorable to the taxpayers) from the Tax Court's decision in No. 82–599, Judge Fay stated that "if income were recognized in one year and percentage depletion deductions calculated on that income were taken in other years, the amount of deduction limits based on taxable income found in secs. 613(a) and 613A(d)(1) would be nonsensical." 76 T. C. 915, 945, n. 10 (1981). At a minimum, the administrative problems would seem to be multiplied by the allowance carryforward provision of § 613A(d)(1), under which an allowance that is disallowed by the 65-percent ceiling in one taxable year is carried forward to subsequent years.

To justify its rejection of an administrative interpretation that is consistent with the statutory language and at least as administrable as any other interpretation, the Court relies in part on the legislative history of § 613A. Contrary to the views of the Court, however, nothing in "the legislative process by which § 613A was enacted," *ante*, at 220, makes it unreasonable to interpret § 613A to disallow percentage depletion for advance royalties and lease bonuses. Section 613A is the product of a major effort in both Houses of Congress in 1975 to abolish the percentage depletion allowance altogether. With minor exceptions not relevant here, H. R. 2166 was amended by the House to accomplish that result. See 121 Cong. Rec. 4651–4652, 4657–4658 (1975). When the full Senate took up consideration of H. R. 2166, after the Senate Finance Committee had reported out a version of the bill that lacked any percentage depletion provisions, Senator Hollings and other Senators sought to abolish percentage depletion immediately for major oil and gas producers and to eliminate it over a 5-year period for independent producers. See *id.*, at 7238–7239. The Senate agreed to repeal percentage depletion for major producers, but initially approved an amendment by Senator Bentsen that would have retained percentage depletion indefinitely with respect to average daily production of 3,000 barrels of oil and an additional 18,000,000 cubic feet of natural gas. See *id.*, at 7304–7305. The Senate thereafter effectively reduced the Bentsen amendment's production figures by two-thirds by lowering the subsidized production levels to either 2,000 barrels of oil or 12,000,000 cubic feet of natural gas. See *id.*, at 7807–7808, 7813. The Conference Committee cut back still further on the surviving allowance by providing for an eventual reduction in both the production figures (from 2,000 to 1,000 barrels) and the depletion percentage itself (from 22 to 15 percent). H. R. Conf. Rep. No. 94–120, p. 68 (1975).

Given that the Congress not only abolished percentage depletion for major oil producers but significantly curtailed it

for independent producers, and given that even the Senate's qualified perpetuation of percentage depletion for independent producers underwent further restrictions before § 613A became law, the silence of the legislative record about the continued availability of percentage depletion for lease bonus and advance royalty income is hardly compelling evidence that Congress meant to preserve the status quo in this one incidental respect. The Court relies on the Conference Report's statement that the Senate version of § 613A (which the Court characterizes as "the proposed legislation," *ante*, at 221) "*retains* percentage depletion at 22 percent . . . for the small independent producer to the extent that his average daily production of oil does not exceed 2,000 barrels a day . . . ." H. R. Conf. Rep. No. 94–120, at 67 (emphasis added). However, as the Seventh Circuit itself pointed out in No. 82–599, the use of the word "retains" casts no light whatsoever on the continued applicability of the *Herring* rule because § 613A(c) "retains" percentage depletion for independent producers regardless of whether physical extraction is made a precondition for the allowance. See 677 F. 2d 594, 600 (1982). Similarly, the Conference Report states only that the conference substitute "follows the Senate amendment in providing a small producer exemption from the *repeal* of percentage depletion," H. R. Conf. Rep. No. 94–120, at 68 (emphasis added); the fact that § 613A does not repeal percentage depletion for independent producers altogether does not mean that § 613A was meant to leave percentage depletion for independent producers untouched. To say, as the Court does, that the Conference Committee agreed to maintain percentage depletion "in its entirety" for producers and royalty owners who satisfied the various newly introduced production limitations in § 613A(c), *ante*, at 221, is to say that Congress preserved percentage depletion unchanged for those who were not affected by the changes—a truism that casts no light on the scope of those changes. The Court's easy conclusion that Congress explicitly would have addressed this Court's decisions in *Herring* v. *Commissioner* and its prog-

eny had Congress meant to alter prevailing depletion rules, see *ante*, at 225, overlooks not only the haste in which Congress acted[2] but also the extent to which § 613A dismantles the entire structure of percentage depletion allowances on which *Herring* rested.

Given the poverty of § 613A's legislative history as a source for the Court's conclusion that the Commissioner's interpretation is unreasonable, the Court ultimately must rest its analysis on its characterization of the underlying purpose of Congress. Reasoning principally from the fact that the Tax Reduction Act of 1975 was enacted during a period of national concern over energy shortages, the Court assumes that Congress' fundamental purpose was to "increase production by the independent producers and royalty owners." *Ante*, at 219.[3] The Commissioner's interpretation of § 613A is taken

---

[2] Section 613A is a relatively minor portion of the Tax Reduction Act of 1975, Pub. L. 94–12, 89 Stat. 26. The principal purpose of the Act was to provide a tax cut to counteract the effects of the then-current recession. Because of the perceived need for an immediate tax stimulus, the Act proceeded through Congress with unusual speed. The amendments that became § 613A were introduced on the floor of both Houses of Congress rather than during committee proceedings, and the time devoted to their consideration and debate was severely limited. See Landis, The Impact of the Income Tax Laws on the Energy Crisis: Oil and Congress Don't Mix, 64 Calif. L. Rev. 1040, 1061, n. 126 (1976).

[3] The Court supports its conclusion that Congress meant to encourage domestic production by quoting the views of Senators and Representatives who spoke of the importance of this goal. *Ante*, at 217–218, n. 15. With the exception of Senator Dole and the less certain exception of Representative Rhodes, however, the legislators on whom the Court relies were opponents of the legislation whose purpose the Court is considering. See, *e. g.*, 121 Cong. Rec. 7813, 8133, 8878–8879 (1975) (votes of Sen. Bartlett and Sen. Curtis); *id.*, at 8124 (remarks of Sen. Bartlett). See also *id.*, at 4606 (remarks of Rep. Rhodes) (noting importance of maintaining domestic energy production and expressing concern whether "we might be going the wrong way" by eliminating percentage depletion). Representative Pickle, whose comment about the need for more energy production the Court quotes, stated in full:

"*I am concerned and disappointed that the oil depletion allowance has been eliminated or severely limited* [by § 613A]. I do not think this will be

to be inconsistent with this purpose because, while it preserves a substantial percentage depletion allowance for independent producers, it results in an effective subsidy smaller than the one produced by the depletion rule of *Herring* v. *Commissioner* and the variations on that rule that the Court surveys. The Court reasons that lessors who desire preproduction payments must either forgo the tax benefits previously associated with those payments or shift to less desirable forms of production-linked payments. In either case, according to the Court, they will demand increased absolute levels of payment to compensate them for the less attractive tax and risk-shifting features of alternative payment schemes, leaving producers with fewer funds for exploration and production and a reduced rate of return on invested capital. In sum, § 613A was meant to maximize production subsidies for independent producers; because the Commissioner's interpretation does not do so, the Court concludes, it is incorrect.

With due respect, this analysis simply ignores the terms and structure of the statute that it purports to construe. Section 613A(c) cannot have been meant to increase production by independent producers over pre-existing levels; it did not create a new tax subsidy but merely preserved an old one. More importantly, that subsidy was not preserved intact but rather was deliberately scaled back. The maximum depletable oil quantity was reduced from 2,000 barrels in 1975 to 1,000 barrels in 1980 and thereafter. See § 613A(c)(3)(B). Even independent producers whose output fell within the 1,000-barrel limit had their production subsi-

---

good for the country. In this time of national energy crisis, what we need—desperately—is more production. The way to get more production is to offer incentives for more drilling. *We have worked in reverse." Id.,* at 8944 (emphasis added).

Presumably the Court has other legislators in mind when it states that the Commissioner's interpretation ignores "the views of those who sought [§ 613A's] enactment, and the purpose they articulated." *Ante,* at 227.

dies substantially curtailed, for the depletion percentage it-self was reduced from 22 percent in 1980 to 15 percent in 1984 and beyond—a 32-percent reduction. See § 613A(c)(5). Congress further limited the subsidy by providing that the percentage depletion allowance could not exceed 65 per-cent of the taxpayer's taxable income. See § 613A(d)(1).[4] Finally, Congress denied percentage depletion to most transferees of interests in "proven" oil and gas property transferred after December 31, 1974. See § 613A(c)(9); H. R. Conf. Rep. No. 94–120, at 67–68.

When read as a whole, therefore, § 613A not only fails to increase incentives for independent producers but actually *reduces* them. This is hardly a remarkable result, since § 613A is the product of a hard-bargained compromise be-tween the Senate conferees, who sought to preserve a stable subsidy for independent producers, and the House conferees, who sought to abolish percentage depletion for independent producers and royalty owners outright. See, *e. g.*, 121 Cong. Rec. 8918 (1975) (remarks of Rep. Ullman). How-ever, it ill accords with the Court's pristine view of § 613A as a carefully calibrated attempt to provide maximum pro-duction incentives to independent producers. Even if disal-lowing percentage depletion of advance royalties and lease bonuses limits the total subsidy available to independent pro-ducers and royalty owners, it is hard to see how this makes the Commissioner's interpretation unreasonable or incorrect when § 613A on its face achieves the same result.[5] In the

---

[4] As previously noted, § 613A(d)(1) contains a carryforward provision, under which an amount disallowed by the 65-percent ceiling "shall be treated as an amount allowable as a deduction . . . for the following tax-able year," subject once again to the 65-percent ceiling. This provision mitigates the effect of the 65-percent ceiling but obviously does not elimi-nate it.

[5] I do not mean to suggest that simply because Congress limited per-centage depletion allowances for independent producers in other ways, it must have chosen to discard the depletion rule of *Herring* v. *Commissioner*

end, the Court's indictment of the Commissioner's interpretation depends on a single-minded congressional purpose that simply did not exist.

## II

The Court purports to accept the principle that the "choice among reasonable interpretations [of federal tax laws] is for the Commissioner, not the courts." *National Muffler Dealers Assn., Inc.* v. *United States,* 440 U. S. 472, 488 (1979). *Ante,* at 224. However, given the compatability of the language of § 613A with the Commissioner's views, the record of legislative compromise that lies behind the statute, the extent to which § 613A restricts percentage depletion for independent producers and royalty owners as well as for major integrated oil and gas companies, and the conceded practical complications caused by attempts to graft *Herring*'s depletion rule onto the new provision, the Court's rejection of the Commissioner's interpretation of § 613A is impossible to square with that principle.[6] The Court's decision therefore concerns me not simply as an interpretation of a discrete section of the Internal Revenue Code but as a sign of the Court's

---

as well. Rather, the fact that Congress substantially limited pre-existing incentives for independent producers makes it impossible to dismiss the Commissioner's interpretation of § 613A as "unreasonable" on the ground that it provides a smaller incentive than rival interpretations.

[6] The Court suggests that the Commissioner's position on the availability of percentage depletion for advance royalty and lease bonus income is inconsistent with his position on the availability of percentage depletion when the year of extraction precedes the year in which income is received. See *ante,* at 215, n. 12. The Court further suggests that the perpetuation of the "bonus exhaustion" rule, under which a lessee must exclude the lease bonuses and advance royalties when computing his "gross income from the property" under § 613(a), cannot be justified if lease bonus and advance royalty income is not subject to percentage depletion in the hands of a lessor. See *ante,* at 225–226. The correctness of the Commissioner's views on these two points is not at issue here and does not affect the reasonableness of the Commissioner's position concerning advance royalties and lease bonuses.

willingness to displace the Commissioner's interpretation of the tax laws with its own views of tax policy. The Commissioner is vested with the responsibility to administer a complex and often ambiguous statutory scheme, and fidelity to the integrity of that scheme requires courts to entertain the Commissioner's settled administrative interpretations with respect. We recognized in *United States* v. *Cartwright*, 411 U. S. 546, 550 (1973), that "this Court is not in the business of administering the tax laws of the Nation." By reading its own conception of desirable federal tax policy into a statute that bears little evidence of having been designed to further those ends, the Court today not only has intruded on the Commissioner's responsibilities in this area but also has disregarded its own.

I dissent.