**AMERICAN BROADCASTING COMPANIES, INC. and ABC, Inc., Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 97–5032.

United States Court of Appeals, Federal Circuit.

Nov. 18, 1997.

Martin D. Ginsburg, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, argued for plaintiffs-appellants. With him on the brief were Alan S. Kaden, Michael L. Waldman, and John D. Petro.

Pamela C. Berry, Attorney, Appellate Section, U.S. Department of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were, Loretta C. Argrett, Assistant Attorney General and Ann B. Durney, Attorney, Tax Division, Department of Justice.

H. Karl Zeswitz, Jr., Baker & Hostetler LLP, Washington, DC, for amici curiae.

Before ARCHER, Chief Judge, RICH and LOURIE, Circuit Judges.

ARCHER, Chief Judge.

American Broadcasting Companies, Inc., and ABC, Inc., (collectively ABC) appeal the judgment of the United States Court of Federal Claims that ABC is not entitled to the investment tax credit under §§ 38 and 48(k) of the Internal Revenue Code (I.R.C.), *see American Broad. Cos. v. United States,* Nos. 475–88T, 489–89T, 1995 WL 579941 (Fed.Cl. July 31, 1995). We reverse.

## BACKGROUND

At issue in this appeal is ABC's eligibility for the investment tax credit under I.R.C. sections 38 and 48(k) for episodes of *All My Children* produced by ABC during tax years 1980–82. Section 48(k) provides:

(1) *Entitlement to Credit—*

(A) *In general.* A credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film or video tape ... only to the extent that the taxpayer has an ownership interest in such film or tape.

. . .

(C) *Ownership interest.* For purposes of this subsection, a person's "ownership interest" in a qualified film shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film.

I.R.C. § 48(k) (1982) (repealed in 1990). The Treasury regulations promulgated to implement this provision further require the taxpayer to have "an ownership interest in at least part of the film." Treas. Reg. § 1.48–8(a)(1) (1982). A "part" is defined as "the

exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas." *Id.* § 1.48–8(a)(2). A safe-harbor provision in the regulations, however, allows the owner to "be treated as having the 'exclusive right to display the film'" if the owner "transfers ... rights to display the film on a limited basis, which do not constitute a transfer of an ownership interest in a part of the film." *Id.* In other words, if the original owner transfers less than a "part," then the original owner is considered to have retained his entire interest for the purposes of the tax credit.

Agnes Nixon conceived the idea of *All My Children* in the 1960s and, with her husband Robert, formed Creative Horizons, Inc. (Creative), a corporation that produced episodes of the series and licensed the domestic network broadcasting rights to ABC. In December 1974, ABC purchased all of Creative's stock and undertook production responsibilities for the show. In a separate agreement with Mrs. Nixon, ABC purchased her "literary" rights in the show, but she purportedly "reserve[d] and [did] not grant to ABC" domestic syndication rights.

It is undisputed that the films at issue are qualified films under § 38 and that ABC is the only potential tax credit claimant because it bore all of the risk of loss. However, the Court of Federal Claims denied ABC the credit because, in its view, ABC had transferred the syndication rights prior to the production of the films and thus owned less than a part of the films at the time of production. Accordingly, the court held that ABC did not qualify for the credit under the safe-harbor provision, although it would have qualified if the transfer had occurred post-production. Moreover, the court determined that ABC failed to allege evidence sufficient to establish that ABC had ever possessed the domestic syndication rights through operation of law or through a transfer from Mrs. Nixon. Thus, the court concluded that ABC is not entitled to the tax credit under the safe-harbor provision because it never possessed a "part" of the film.

## DISCUSSION

On appeal, we review a grant of summary judgment by the Court of Federal Claims *de novo*, with justifiable inferences drawn in favor of the non-moving party. *See Winstar Corp. v. United States*, 64 F.3d 1531, 1539 (Fed.Cir.1995) (in banc), *aff'd*, —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ At issue in this appeal is the interpretation of § 48(k). Statutory interpretation is a question of law subject to *de novo* review. *See Ishida v. United States*, 59 F.3d 1224, 1229 (Fed.Cir.1995). We defer to the agency's interpretation of a statute, however, if it does not contravene clear, discernible legislative intent. *See id.; see also Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Thus, review of an agency's construction of a statute which it administers requires two steps: we must first determine whether Congress has spoken directly to the precise question at issue, and, if it has not, then we must determine whether the agency's construction is permissible. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

■ ABC contends that, because § 48(k) unambiguously bases a taxpayer's "ownership interest" solely on the risk of loss and because ABC is the only party with such risk, it is entitled to the tax credit. According to ABC, the Treasury regulations only apply when multiple parties claim the income tax credit.

We agree. The statute makes no reference to considerations other than the risk of loss, and nothing in the legislative history suggests any additional considerations. *See United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) ("If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'"

(quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2055, 64 L.Ed.2d 766 (1980))). Indeed, the relevant legislative history demonstrates that the producer of eligible films is generally to receive the credit. *See, e.g.,* S.Rep. No. 94–938, at 191–92 (1975) ("[A] taxpayer will be treated as having an ownership interest to the extent that his capital is at risk.... [T]he producer-distributor will also generally be entitled to the credit where the film is exhibited over the network pursuant to a licensing agreement."). The legislative history also demonstrates that recourse to regulations is only appropriate when there is more than one claimant for the credit. *See id.* at 192 ("Generally, where more than one party bears the risk of loss with respect to a particular film, the Secretary of the Treasury or his delegate may establish procedures for determining who is entitled to the credit, or partial credit.").

The government, however, contends that this court recognized the ambiguity of § 48(k)(1)(C) in *American Broadcasting Cos. v. United States*, 851 F.2d 329, 332 (Fed.Cir. 1988) (*ABC*). *ABC*, however, is inapposite because in that case there were two parties claiming the credit and because the ambiguity involved whether an "ownership interest" had to be depreciable. As such, the court did not address the present situation in which there is only one claimant and an admittedly qualified interest.

Application of Treas. Reg. § 1.48–8(a)(1) in this case also would have the anomalous result of foreclosing the tax credit for an otherwise eligible film. Nothing in the statute or legislative history suggests that Congress intended such a result. *Cf. Commissioner v. Engle*, 464 U.S. 206, 226, 104 S.Ct. 597, 608, 78 L.Ed.2d 420 (1984) (noting that the Commissioner's interpretation "unreasonably denies that industry a subsidy Congress expressly contemplated it should receive. Such an interpretation is 'unrealistic and unreasonable,' and therefore is not entitled to deference." (quoting *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973))).

In addition to the unambiguous language of the statute, ABC also qualifies for the

credit under the regulations because it is the owner of the films at issue through operation of the copyright laws. A copyright affords the owner the exclusive right, *inter alia*, "in the case of ... motion pictures and other audiovisual works to display the copyrighted work publicly." 17 U.S.C. § 106(4) (1994). This right includes syndication rights. *See* 17 U.S.C. § 101 (defining "perform" as "to show images in any sequence or to make the sounds accompanying it audible" and "publicly" as "to perform [the work] at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered"). The copyright initially vests with the author of the work. 17 U.S.C. § 201(a) (1994).

It is undisputed that the episodes at issue fall within the category of audiovisual works. Also, ABC submitted copies of its copyright certification, thus establishing a prima facie case of authorship. *See* 17 U.S.C. § 410(c) (1994); *see also Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 59 (1st Cir.1997). The government has failed to produce any evidence to rebut this prima facie showing; thus, we take as proven that ABC is the author in whom the exclusive rights initially vest. *See, e.g., Schumann v. Albuquerque Corp.*, 664 F.Supp. 473, 475 (D.N.M.1987). ABC thus possessed the entire bundle of rights afforded under § 106 once the films were produced.[1] Mrs. Nixon therefore did not possess any rights that she could "retain."[2] Instead, the agreement's only effect was to give Mrs. Nixon the exclusive contractual rights to domestic syndication in each film as it was produced. As such, ABC falls within the safe-harbor provision because it transferred less than a part to Mrs. Nixon.

The government responds that the court should rely solely on the contracts and the circumstances surrounding them, and not the copyright laws, to determine ownership because ownership under the copyright and tax laws are distinct legal concepts. The government, however, neither offers any authority for this proposition nor provides a persuasive reason why the copyright laws should not determine who originally possessed the syndication rights. Indeed, case law supports the contrary view. *See, e.g., Tolwinsky v. Commissioner*, 86 T.C. 1009, 1042–43, 1986 WL 22132 (1986) (performing analysis under Copyright Act to determine ownership for tax purposes). While contract law allows parties to transfer property rights, copyright law determines the initial allocation of rights such as those involved in this case. *Compare* 17 U.S.C. § 201(a) (1994) (vesting copyright initially in the author) *with id.* § 201(d) (allowing transfer of copyright ownership).

Accordingly, ABC is entitled to the investment tax credit under § 48(k), and the judgment of the Court of Federal Claims is reversed.

*REVERSED.*

---

**1.** Because the copyright vests initially with the author once the author fixes the work in a tangible medium, *see* 17 U.S.C. § 102(a) (1994); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1160 (1st Cir.1994), we reject the trial court's conclusion that, at the time of production, ABC did not own the syndication rights and, thus, could not qualify for the tax credit. To the contrary, ABC could not have possessed those rights until the films were produced and thereby fixed in a tangible medium.

**2.** The parties contest what effect, if any, the fact that Agnes Nixon created the idea of the show along with some of the characters has on any copyright interest held by ABC. At best, Ms. Nixon's rights in the show would make the individual episodes produced by ABC derivative works. *See* 17 U.S.C. § 103 (1994). Assuming *arguendo* that the films at issue are derivative works, a copyright in a derivative work is independent of any copyright in the original work. *See id.* § 103(b). Thus, ABC alone obtained the exclusive rights, including the syndication rights, to those films but was obligated by contract to permit Mrs. Nixon to be the exclusive domestic syndicator of the films.