INTERNATIONAL FLAVORS & FRAGRANCES, INC., A NEW YORK CORPORATION, PLAINTIFF-RESPONDENT, v. DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF TREASURY, STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued October 22, 1985—Decided April 10, 1986.

*Harry Haushalter,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Deborah T. Poritz,* Deputy Attorney General, of counsel).

*Laurence Reich,* argued the cause for respondent (*Carpenter, Bennett & Morrissey,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal requires us to interpret provisions of the New Jersey Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40. Under the Act, the tax is measured by a corporation's net worth and net income. This case concerns the calculation of net income. Specifically, at issue is *N.J.S.A.* 54:10A–4(k)(1) (section 4(k)(1)), which provides that 100% of the dividends that a corporate taxpayer receives from a subsidiary owned by the taxpayer "to the extent of 80% or more ownership of investment" shall be excluded from the taxpayer's net income. The critical question is whether section 4(k)(1) requires direct record ownership of 80% of a subsidiary's stock or whether it is permissible for the corporate taxpayer and its wholly-owned subsidiary to aggregate the stock that they own in the dividend-paying subsidiary in order to satisfy the 80% ownership test.

I

The facts are stipulated. International Flavors and Fragrances, Inc. (IFF), a New York corporation authorized to do business in New Jersey, is subject to the New Jersey Corporation Business Tax Act. During 1975 and 1976, the tax years in issue, IFF owned 100% of the capital stock of International Flavors & Fragrances IFF (Nederland) B.V. (IFF–Holland), 30%

of the capital stock of International Flavors & Fragrances IFF (France) S.A.R.L. (IFF–France), and 63% of the capital stock of I.F.F. Essencia & Frangrancias Ltda. (IFF–Brazil). IFF's wholly-owned subsidiary IFF–Holland owned all of the remaining stock of IFF–Brazil and IFF–France.

During the tax years 1975 and 1976, IFF received dividends from IFF–France and IFF–Brazil that it included in its taxable income for federal income-tax purposes.[1] On its New Jersey corporation business-tax return, IFF excluded from its entire net income-tax base 100% of the dividends that it received from IFF–France and IFF–Brazil pursuant to section 4(k)(1).[2]

The Director of the New Jersey Division of Taxation, Department of the Treasury (the Director), took the position that "80% or more ownership of investment" required that IFF be the *direct record owner* of the stock of IFF–Brazil and IFF–France. Consistent with this interpretation, the Director issued a final determination that IFF had underreported its net income-tax base by failing to include 50% of the dividends that it had received from IFF–France and IFF–Brazil during the tax

---

[1]Under the Internal Revenue Code, IFF–France and IFF–Brazil were deemed controlled foreign corporations of IFF. *See* 26 U.S.C. § 6038 (1982). For federal tax purposes, control over a foreign corporation is defined as:

(1) Control.—A person is in control of a corporation if such person owns stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock, of a corporation. *If a person is in control (within the meaning of the preceding sentence) of a corporation which in turn owns more than 50 percent of the total combined voting power of all classes of stock entitled to vote of another corporation, or owns more than 50 percent of the total value of the shares of all classes of stock of another corporation, then such person shall be treated as in control of such other corporation.* * * *

[26 U.S.C. § 6038 (emphasis added).]

[2]It is stipulated that solely because of an oversight, IFF did not exclude 50% of its investment in IFF–France and IFF–Brazil from its net worth base. Such an exclusion would have been consistent with its interpretation of *N.J.S.A.* 54:10A–4(d).

years in issue.[3] The Director, therefore, assessed additional taxes and interest for those years. IFF filed a complaint with the Tax Court, contending that it met the "80% or more ownership of investment" test by aggregating IFF and IFF–Holland's direct ownership of stock in IFF–France and IFF–Brazil. Thus, IFF argues that it was entitled to the 100% dividend exclusion from net income even though it was not the record owner of 80% of the stock of IFF–Brazil and IFF–France, because the remainder of the stock of those corporations was owned by IFF–Holland, its wholly-owned subsidiary.

The Tax Court held that IFF–France and IFF–Brazil were 80%–owned subsidiaries of IFF under section 4(k)(1) and therefore IFF was entitled to the 100% dividend exclusion. 5 *N.J.Tax* 617 (1983). In a published *per curiam* opinion, the Appellate Division affirmed, 7 N.J.Tax 652, essentially for the reasons stated in the Tax Court's opinion, with a brief additional discussion of *Fedders Fin.Corp. v. Director, Div. of Taxation*, 96 *N.J.* 376 (1984), and *Mobay Chem. Corp. v. Director, Div. of Taxation*, 96 *N.J.* 407 (1984).

## II

The New Jersey Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40, enacted in 1945, requires a corporation to pay a franchise tax "for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State." *N.J.S.A.* 54:10A–2. The tax is assessed on the basis of entire net income. *N.J.S.A.* 54:10A–5.

Entire net income is defined as total net income from all sources, and is deemed *prima facie* equal to the taxable income that the taxpayer is required to report to the United States

---

[3]*N.J.S.A.* 54:10A–4(k)(1) provides that all dividends, regardless of the source, are subject to an automatic 50% exclusion from net income. Dividends received by a corporate taxpayer from a subsidiary in which it has "80% or more ownership of investment" are subject to a 100% exclusion.

Treasury Department, with exceptions that are not pertinent here. *N.J.S.A.* 54:10A–4(d), –4(b), –5. The Act provides for certain adjustments to federal taxable income. One such adjustment is at issue in this case, namely, *N.J.S.A.* 54:10A–4(k)(1), which states:

> Entire net income shall exclude 100% of dividends which were included in computing such taxable income for federal income tax purposes, paid to the taxpayer by one or more subsidiaries owned by the taxpayer to the extent of the *80% or more ownership of investment described in subsection (d) of this section.* With respect to other dividends, entire net income shall not include 50% of the total included in computing such taxable income for federal income tax purposes * * *. (Emphasis added.)

"Ownership of investment" is described in *N.J.S.A.* 54:10A–4(d) (section 4(d)), which provides for a reduction in the net worth of a corporation. In pertinent part, it reads:

> The foregoing aggregate of values shall be reduced by 50% of the amount disclosed by the books of the corporation for investment in the capital stock of one or more subsidiaries, which *investment is defined as ownership (1) of at least 80% of the total combined voting power of all classes of stock of the subsidiary entitled to vote and (2) of at least 80% of the total number of shares of all other classes of stock except nonvoting stock which is limited and preferred as to dividends.* In the case of investment in an entity organized under the laws of a foreign country, the foregoing requisite degree of ownership shall effect a like reduction of such investment from net worth of the taxpayer, if the foreign entity is considered a corporation for any purpose under the United States federal income tax laws, such as (but not by way of sole examples) for the purpose of supplying deemed-paid foreign tax credits or for the purpose of status as a controlled foreign corporation. (Emphasis added.)

The critical question is whether the New Jersey Legislature intended to exclude from a corporation's net income base 100% of the dividends that it receives from an *indirectly-owned* subsidiary. We look first at the statutory language. It is a well-established principle of statutory construction that a court should follow the clear import of statutory language. *Fedders Fin. Corp. v. Director, Div. of Taxation,* 96 *N.J.* at 385. Neither *N.J.S.A.* 54:10A–4(k)(1) nor *N.J.S.A.* 54:10A–(4)(d) contains an express requirement of record ownership. Section 4(k)(1) refers to "ownership of investment" and section 4(d)(1) speaks in terms of "total combined voting power." Therefore, to aid in

interpreting the statute, we look beyond its words to examine, first, the Legislature's purpose in adopting the 80%-of-owner-ship-of-investment requirement, and second, the ordinary and well-understood meaning of ownership in the corporate world. Such an examination discloses that the Legislature intended that the 80%-ownership test be satisfied by aggregating a corporate taxpayer's stock with that of its wholly-owned subsidiary in a dividend-paying subsidiary.

First, the terms used by the Legislature in *N.J.S.A.* 54:10A–4(k)(1), and in the pertinent part of *N.J.S.A.* 54:10A–4(d), all reflect the same objective. That objective, revealed in the first sentence of section 4(k)(1), is to provide relief from the potential double taxation that inheres in the taxation of corporate dividends received from a corporate subsidiary.

The 1968 amendments to the Corporation Business Tax Act, *L.* 1968, *c.* 250, which provide for the 100% exclusion of subsidiary dividends and for the section 4(d) definition of subsidiary, were designed to implement the recommendations of the State Tax Policy Commission (the Commission). It is clear that a major concern of then-Governor Richard J. Hughes and the Commission was to remove impediments to New Jersey's economic growth. Among those impediments was the treatment "afforded corporations which do business in New Jersey but also have substantial investment in subsidiaries, especially foreign subsidiaries incorporated in foreign countries and in other states." Commission on State Tax Policy, *The 12th Report* at XV (1968). By letter to Senator Toolan, Governor Hughes requested the Commission to study a number of proposals, including a proposal to eliminate the "taxation of dividends received by a parent company from a subsidiary company ..." Letter from Governor Richard J. Hughes to Senator John E. Toolan (May 25th, 1967), *reprinted in* Commission on State Tax Policy, *The 12th Report* at 115. Moreover, the Governor requested the Commission "to review the New Jersey corporate tax structure, with particular reference to its effect on the

216

location of corporate headquarters and their capital investment employment in the state." Commission on State Tax Policy, *The 12th Report* at 31. The Commission's Report found that two of the three significant areas of inequity in the corporate-tax law, as it stood prior to the amendments, were its treatment of subsidiary capital and subsidiary dividends. *Id.* at 44. It considered those two areas of inequity to be negative factors when corporations considered where to locate their head-quarters. The Commission Report stated:

> Dividends received from such subsidiaries are also an important tax factor. Under the present tax law such subsidiary capital is included in the tax base for the net worth tax, and 50% of the dividends received by the parent corporation from the subsidiary are included in the tax base for the income tax. The result is that major corporations will find a serious tax disadvantage in locating their corporate headquarters in New Jersey, especially if they do a national or worldwide business in which subsidiaries are often a required form of business organization. These same corporations *can be a source of important economic development, jobs and tax base for the state.* [*Id.* (emphasis added.)]

In the Press Release accompanying the amendment, Governor Hughes proclaimed the revisions as essential to the continuation of the equitable relationship between government and commerce. *New Jersey Press Release Accompanying S. 837* (1968). He stated:

> These adjustments derive from recommendations of the State Tax Policy Commission, which was established to insure that New Jersey is not left behind by other states whose tax policies have *taken into account the multi-state nature of so much of today's big business.* The division of income and net worth among several taxing jurisdictions, each with a legitimate interest in a business concern, presents one of the most complex and far-reaching questions which government must resolve. We in New Jersey, by this change in our law, make crystal clear our determination to derive from industry and commerce *no more than* a full fair share of financial support. (Emphasis added.)

The Commission's Report and Governor Hughes' statement make it clear that the major reason for the 1968 amendments adopting section 4(k)(1) was to encourage corporations to locate in New Jersey by removing the added tax on dividend income received from a subsidiary. Both the Commission and the Governor thought that New Jersey's corporate tax policy was

shortsighted, particularly with respect to the taxation of investments in, and dividends from, subsidiaries of large multi-national corporations. To make New Jersey competitive with those other states, the Commission recommended the adoption of section 4(k)(1). In so doing, the Commission and the Governor believed strongly that such corporations would be an important boost to the economic growth of the state, leading to more jobs and eventually to more taxes for the state. The solution that the Legislature chose—to offer tax incentives to businesses in order to encourage them to locate in this state—is not usual. Legislatures do so because they think that the benefit the entire state will derive from the infusion of new economic blood into its economy more than compensates for any temporary loss of tax revenue that it may incur.

Given the Legislature's clear objective to encourage economic growth by removing the tax on the dividends that a corporation receives from its subsidiary, we do not believe that it intended to differentiate between first-tier and second-tier subsidiaries. Whether a corporation directly owns 80% of a subsidiary's stock (first tier) or whether it indirectly owns 80% of the subsidiary's stock through a wholly-owned subsidiary (second tier) is of no matter. A corporation deciding where to locate is hardly less deterred by a tax on its second-tier subsidiary than by one on its first. IFF and its subsidiaries, notwithstanding their complex structure, retained the essential unity that the Legislature intended to favor by its enactment of *N.J.S.A.* 54:10A–4(k)(1).

The Director urges that we ignore the Legislature's intent and interpret the statutory provisions on the basis of the Division of Taxation's administrative practice. Since the enactment in 1968 of the statutory provisions in question, the Division of Taxation has consistently interpreted the term "subsidiary," as defined by *N.J.S.A.* 54:10A–4(d), and as used in *N.J.S.A.* 54:10A–4(k)(1), –4(d), and 54:10A–9, to require the taxpayer corporation to have actual ownership of 80% of the total

voting and nonvoting stock of another corporation, except non-voting stock that is limited and preferred as to dividends.[4]

Recently, in two tax cases, we specifically addressed the deference to be given an administrative agency's construction of a statute. In *Airwork Servs. Div. v. Director, Div. of Taxation,* 97 *N.J.* 290, 296 (1984), we acknowledged that the practical administrative construction of a statute over a period of years should be given great weight by the courts. Nevertheless, as we stated in *Airwork,*

[t]he court will consider this factor only when it is not [sic] satisfied that the Legislature's intent cannot otherwise be determined by a critical examination of the purposes, policies, and language of the enactment. When such circumstances point strongly to the imputation of a particular legislative intent, they may not be outweighed or overcome simply by a countervailing administrative practice. [*Airwork,* 97 *N.J.* at 298.]

In its deference to agencies' interpretations of statutes, the dissent disregards this clear admonition.

Likewise in *Fedders Fin. Corp. v. Director, Div. of Taxation,* 96 *N.J.* 376, 392 (1985), we stated:

It is well established that the Director's *regulatory authority cannot go beyond the Legislature's intent as expressed in the statute.* As Justice Clifford observed in *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 563 (1976), "an administrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment." (Emphasis added.)

Deference to an agency in its administration of a statute, however, does not overcome the abundantly clear purpose of the legislation. Because the legislative purpose in this case is so apparent, the Director's reliance on the Division of Taxation's administrative practice is misplaced.[5]

---

[4]The Director has not stated his position on record ownership in any regulation promulgated pursuant to the rulemaking requirements of the New Jersey Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –13. He has promulgated only one regulation, *N.J.A.C.* 18:7–4.11, to interpret *N.J.S.A.* 54:10A–4(d), and that regulation does no more than reiterate the statute.

[5]Equally without merit is the Director's extension of the general rule that tax exemptions are to be construed against a taxpayer to what he characterizes as "an item of tax preference"—a term not to be found anywhere in the statute and for which the Director does not provide a definition. That general rule is

## III

The Court's interpretation of the statute accords not only with the Legislature's purpose but also with the ordinary and well-understood meaning of ownership in the corporate world. In examining statutory language, we are mindful that in the absence of an explicit indication of a special meaning, words will be given their ordinary and well-understood meaning. *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 556 (1976).

Clearly, IFF possessed one-hundred percent of "the ownership of investment" in IFF–Holland, and through its ownership of IFF–Holland it possessed 100% of the ownership of investment in IFF–France and IFF–Brazil. Thus, for all practical intents and purposes IFF owned 100% of the investment in IFF–France and IFF–Brazil, as well as in IFF–Holland. Equally important, IFF owned 100% of the "total combined voting power" of IFF–Brazil and IFF–France because IFF owned 100% of IFF–Holland, and therefore it was able to control the voting power of IFF–Holland. Thus, IFF effectively owned not merely 80% but 100% of the ownership of investment. Such a holding conforms with the economic realities of the corporate world and with the statute.[6]

---

merely a presumption. The ultimate inquiry remains legislative intent. *MacMillan v. Director, Div. of Tax.,* 180 *N.J.Super.* 175, 178 (App.Div.1981), aff'd, 89 *N.J.* 216, 218 (1982) (Pashman, J., dissenting).

We likewise find unpersuasive the Director's reliance on the New Jersey Business Corporation Act, *N.J.S.A.* 14A:1–2(r), which defines subsidiary "to mean a corporation whose outstanding shares are owned directly or indirectly by another corporation," as proof that the Legislature knew how to incorporate an indirect ownership test when it desired one. We agree with the Tax Court that the Business Corporation Act's language cannot sensibly be used to give meaning to the language of the Corporation Tax Act. 5 *N.J.Tax* at 626.

[6]We limit this holding to cases where the corporate taxpayer and its wholly-owned subsidiary together own 100% of the direct ownership of the stock of the dividend paying subsidiary. We do not decide whether the ownership of stock by a parent may be aggregated with that of a less-than-wholly-owned subsidiary in order to satisfy the 80%-or-more ownership test in a second subsidiary.

One final point. We do not accept the Director and the dissent's contention that we rejected precisely this sort of look at economic reality in *Fedders Fin. Corp. v. Director, Div. of Taxation*, 96 *N.J.* 376 (1984), and *Mobay Chem. Corp. v. Director, Div. of Taxation*, 96 *N.J.* 407 (1984), and instead focused on the literal language of the pertinent statutes. To the contrary, in those cases the majority and dissent chose between their alternate views as to which economic factors most influenced legislative intent.

In *Fedders*, we addressed an entirely different issue. The concept of "ownership of investment" that is central to this case was never addressed. The taxpayer Fedders Financial Corporation, a wholly-owned subsidiary of its corporate parent, created a subsidiary Fedders Capital, N.V., from which it borrowed sums raised by that subsidiary in the Eurodollar market. The narrow legal issue was whether the debt owed by Fedders Financial to its subsidiary, Fedders Capital, constituted an indebtedness that was owed "indirectly" by Fedders Financial to its own parent, Fedders Corporation, within the meaning of "indebtedness owing directly or indirectly" under *N.J.S.A.* 54:10A–4(e). This Court held that in order to come within the phrase "indebtedness owing directly or indirectly," the taxpayer must be indebted to its stockholder, and that loans between affiliated corporations of a common parent are not presumed conclusively to be loans to the parent. This Court found the Director's *per se* approach to the question—conclusively presuming loans among parties under common control to be tantamount to loans to the common parent—to be inconsistent with the language and intent of the statute. Such a *per se* approach would be in total disregard of economic reality. Our holding here and our holdings in *Fedders* and *Mobay* emphasize the need to look at the statute and legislative intent. In each of those cases we considered economic reality only to aid in interpreting the statute, not to substitute judicial will for legislative enactment.

In conclusion, we hold that the Legislature in enacting the 80%-or-more-ownership-of-investment test in section 4(k)(1) intended that a corporate taxpayer could aggregate its ownership of stock in a dividend-paying subsidiary with the stock owned in such subsidiary by its wholly-owned subsidiary. This holding conforms with the strongly-expressed legislative intent and with the language of the statute.

Accordingly, we affirm the judgment of the Appellate Division.

CLIFFORD, J., concurring.

My vote with the majority opinion is cast with the understanding that in reaching its result, the Court does not at all intend to undermine an extremely important principle, one that forms the basis for the dissent: that the choice among reasonable interpretations of statutes that delegate enforcement and rulemaking power to administrative agencies is for those agencies to make, not for the courts. *Post* at 222–24. The flipside of that proposition is equally important: if the legislation, when read with an eye fixed not simply on its language but as well on its underlying background and history, is susceptible of but one meaning, then a contrary meaning attributed to the enactment by the administrative agency responsible for its enforcement must be disregarded.

We tend to use familiar and comfortable expressions like "arbitrary" and "unreasonable" in characterizing administrative interpretation of legislation that courts find is not in keeping with the "plain meaning" of a statute. What we are really driving at is that there is no room for agency interpretation: the act can have only one meaning, and the agency's reading is just plain wrong.

I am quick to acknowledge that for me, the meaning of taxing statutes does not always leap off the page with the same pellucidity as, say, an act prohibiting careless driving (see *N.J.S.A.* 30:4–97). So much of the blame for that regrettable

circumstance as does not repose in my own shortcomings may inhere in the very nature of the subject. Tax law is sometimes arcane. The statutes dealing with it can become elaborate, even baroque—witness the Internal Revenue Code, not much in demand for a quiet afternoon in the hammock. And like Judge Simon Rifkind, "I would no more have the audacity to formulate my own tax return than I would engage in open heart surgery." See *Oakwood at Madison, Inc. v. Township of Madison*, 72 *N.J.* 481, 636 (1977) (concurring opinion) (quoting Rifkind, *Are We Asking Too Much of Our Courts?*, 15 *Judge's J.* 43 (1976)).

So although I have not found the road to decision of this appeal an easy one, I am satisfied that Justice Garibaldi's opinion persuasively makes the case for but one interpretation of the legislation that we are called on to examine. I therefore join in that opinion, again with the understanding that we are leaving intact the principles set forth at the beginning of this concurrence.

O'HERN, J., dissenting.

I do not disagree with the majority's tax policy as expressed in this case. But I disagree with their right to choose that policy in the face of the Commissioner's reasonable interpretation of the act.

The language of the statute obviously is far from definitive; it lends itself to either interpretation—the one advanced by the taxpayer or the one by the State. That being so, the policy choice should be left to the agency so long as it is not unreasonable.

This conclusion flows from what has been described as "the prevailing judicial orthodoxy" with respect to the interpretation of statutes that delegate enforcement and rulemaking power to administrative agencies. Diver, *Statutory Interpretation in the Administrative State*, 133 *U.Pa.L.Rev.* 549, 562 (1985). The principle holds that once it is determined that the plain

meaning of the statute fails to solve the inquiry—and if the attributes of the agency's legal authority and function are appropriate—a court should grant deference to the agency. The court's task is converted from determining whether the contested interpretation is correct to determining whether it is reasonable. *Id.* at 562.

The United States Supreme Court has adopted just such an approach in interpreting federal law:

> the task for the Court * * * was not to interpret the statute as it thought best but rather the narrower inquiry into whether the [agency's] construction was "sufficiently reasonable" to be accepted by a reviewing court.
>
> [*Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 *U.S.* 27, 39, 102 *S.Ct.* 38, 46, 70 *L.Ed.* 2d 23, 34 (1981) (citations omitted).]

*See also United States v. Riverside Bayview Homes, Inc.,* 474 *U.S.* ——, ——, 106 *S.Ct.* 455, 461, 88 *L.Ed.*2d 419, 429 (1985) (an agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the express intent of Congress).

Since I believe that the statute's plain meaning not only does not suggest the majority's holding, but the contrary, and since the Division of Taxation has not only the greatest expertise in this area but also the primary and substantial responsibility for administering and enforcing the act—and has as well extensive rulemaking and administrative powers—its attributes and functions warrant the application of the principle of deference. Justice O'Connor recently reiterated this principle with respect to federal tax law: "the 'choice among reasonable interpretations is for the Commissioner, not the courts.'" *Commissioner v. Engle,* 464 *U.S.* 206, 224, 104 *S.Ct.* 597, 608, 78 *L.Ed.*2d 420, 434 (1984) (holding that IRS Commissioner's interpretation in the matter was unreasonable and not entitled to deference) (quoting *National Muffler Dealers Ass'n, Inc. v. United States,* 440 *U.S.* 472, 488, 99 *S.Ct.* 1304, 1312, 59 *L.Ed.*2d 519, 531 (1979)). Similar principles have long been followed in New Jersey. *Atlantic City Transp. Co. v. Director, Div. of Taxa-*

*tion,* 12 *N.J.* 130, 146 (1953); *Ridolfi v. Director, Div. of Taxation,* 1 *N.J.Tax* 198, 203 (Tax Ct.1980).

## I.

Applying these principles of law to this case, I cannot agree that the construction imposed upon the statute by the Director of the Division of Taxation is unreasonable. On the contrary, if we follow the most fundamental principles of statutory construction, we should find the Director's construction not only reasonable, but the one that should best be made in accordance with law.

## A.

The statute's plain language supports the position taken by the Division of Taxation. *See Service Armament Co. v. Hyland,* 70 *N.J.* 550, 556 (1976) (statutes should be construed in accord with their plain meaning). At issue in this case is the appropriate criterion for determining the investment-ownership requirement for purposes of the subsidiary-dividend exclusion in *N.J. S.A.* 54:10A–4(k)(1). The critical statutory language is not, as the majority would have us focus, the phrase "80% or more ownership of investment"; rather, the critical language is the definition of that phrase as set forth in subsection (d) of section 54:10A–4. That subsection specifically defines the qualifying investment as

> *ownership* (1) of at least 80% of the total combined voting power of all classes of stock of the subsidiary entitled to vote and (2) of at least 80% of the total number of shares of all other classes of stock except nonvoting stock which is limited and preferred as to dividends. (Emphasis added).

Thus, in accordance with the plain language of the statute, in order to meet the test for exclusion the parent must "own" at least 80% of the subsidiary's voting stock. Nothing on the face of the statute supports the majority's contention that *indirect* control of at least 80% of the subsidiary's stock is enough. IFF simply does not *own* the requisite percentage of second-tier subsidiary stock.

It might be tempting to ignore the subsidiary structuring of IFF's operations in order to focus on the reality of corporate control and thereby equate indirect with direct ownership. But generally speaking, taxpayers have not been allowed to disavow the corporate structures they have fashioned for their own business convenience on the mere assertion that one form of organization is functionally equivalent to another. *General Trading Co. v. Director, Div. of Taxation*, 83 *N.J.* 122, 136–37 (1980). We have consistently held business organizations to the consequences of the structure they have chosen, if for no other reason than "the administrative burden may well be too much if a state must explore the ramifications of corporate structures to determine the justice of recognizing or ignoring corporate entities in each factual complex." *Household Fin.Corp. v. Director, Div. of Taxation*, 36 *N.J.* 353, 363, *appeal dismissed, cert. denied*, 371 *U.S.* 13, 83 *S.Ct.* 41, 9 *L.Ed.*2d 49 (1962). Accordingly, IFF should be held to the consequences of its chosen form.

Given that the statute does not plainly extend the dividend exclusion to a parent corporation with indirect control of a second-tier subsidiary, we should defer to the Director's plausible interpretation that the exclusion applies only to the parent with direct ownership of the subsidiary.

### B.

The Director's position is buttressed by a second rule of statutory construction that "tax preference provisions are to be strictly construed, and ambiguities resolved against those claiming exemption." *Body-Rite Repair Co. v. Director, Div. of Taxation*, 89 *N.J.* 540, 544 (1982) (citing *MacMillan v. Director, Div. of Taxation*, 180 *N.J.Super.* 175 (App.Div.1981), *aff'd o.b.*, 89 *N.J.* 216 (1982)). If there is doubt about the plain meaning of the statute, then strict construction of the preference leads to the conclusion that since the taxpayer simply does not "own"

80% of the stock of the second-tier subsidiary, it is not entitled to the dividend exclusion.

The Legislature knows quite well how to deal with the definition of subsidiaries, whether directly or indirectly owned. In defining a subsidiary under the New Jersey Business Corporation Act, *N.J.S.A.* 14A:1–1 to :18–12, the Legislature expressly included an indirect ownership standard: " 'Subsidiary' means a domestic or foreign corporation whose outstanding shares are owned directly or indirectly by another domestic or foreign corporation in such number as to entitle the holder at the time to elect a majority of its directors without regard to voting power which may thereafter exist upon a default, failure or other contingency." *N.J.S.A.* 14A:1–2(r).

The absence of the term "indirect" in the definition of subsidiary under *N.J.S.A.* 54:10A–4(d) evidences that only actual, direct ownership by a taxpayer of 80% of the stock of another corporation satisfies the subsidiary test for the 100%-dividend exclusion. Strictly construed, that is the statutory language.

### C.

The majority has had to skirt its own recent decisions in *Fedders Fin. Corp. v. Director, Div. of Taxation*, 96 *N.J.* 376 (1984), and *Mobay Chem. Corp. v. Director, Div. of Taxation*, 96 *N.J.* 407 (1984), to reach this result. In those cases, the Court admonished the Director to reject concepts of economic reality and focus instead on the literal language of the pertinent statutory sections. It was crucial, the Court said in *Fedders* and *Mobay*, that the debt be owed directly to the parent or controlling stockholders for it to be included in the taxpayer's tax base. *Fedders, supra,* 96 *N.J.* at 388–89. Having been told in *Mobay* and *Fedders* that he should not expand the concept of subsidiary ownership to incorporate the economic reality of corporate control in evaluating corporate-debt structure, the Director could hardly be expected to anticipate being faulted, in this tax-preference context, for failing to expand the

relationship between the corporations to include the indirect-ownership aspects in evaluating equity structure.

As noted, the majority suggests the use of the concept of "ownership of investment" evidences a consideration by the Legislature of the economic realities of the investment by parents and subsidiaries rather than concern with the specific manner in which the investment is held. But the origin of the generic phrase "ownership of investment" is due to the fact that corporations have a variety of security interests that represent varying degrees or qualitative aspects of ownership. The Legislature, in subsection (d), has made it clear that it was concerned primarily with the voting stock of the corporation. What it is concerned about is power. Yet power cannot clearly be discerned unless we understand the requirements of the foreign law under which IFF's subsidiaries are incorporated.

Excursions into the variety of subsidiary structures that a domestic corporation may use will invariably propel us into the murky waters of foreign corporation laws and international high-finance, all in order to answer the question whether the New Jersey directors of the parent can dictate the moves of the foreign subsidiary even though removed by one or more levels of corporate structure. Foreign corporation laws may, for example, require a subsidiary to maintain an independent board of directors composed of nationals of that country with interests that differ markedly from those of their parental counterparts. Since the issue was never raised, we do not have a clear showing that IFF-Holland is for all purposes a robot of IFF in the voting of the shares of IFF-Brazil and IFF-France. In future cases, the relationships will have to be analyzed carefully. Under such circumstances, we should not rewrite the language of sections 54:10A–4(d) and 4(k)(1) in order to equate indirect and direct ownership.

Finally, it is apparent that the decision in this case imports into our State tax law concepts relevant to the treatment

afforded parent-subsidiary corporations under the federal Internal Revenue Code. Under the I.R.C., corporations that are members of an "affiliated group," as defined in *I.R.C.* § 1504(a), are entitled to file consolidated returns, *id.* § 1501, and, under certain circumstances, may deduct from adjusted gross income dividends received from other members of the affiliated group. *See, e.g., I.R.C.* §§ 243 and 245(b). Such concepts should not bear on the decision in this case. Consolidated returns have never been permitted in New Jersey, *United States Steel Corp. v. Director, Div. of Taxation,* 38 *N.J.* 533, 546 (1962); and to the extent section 54:10A–4(k)(1) allows certain tax-free distributions between related corporations, nothing suggests that our Legislature contemplated the expansive concept of the "affiliated group" embodied in federal law. The wisdom of affording corporations similar treatment under state law—either by exclusion from entire net income, deduction, credit, or the use of consolidated returns—is another question entirely. But if aspects of our tax laws are to be remade in the federal image, the decision to do so should be made in the Legislature, not here.

## II.

Above and beyond all the canons of statutory construction, for me, the compelling reason why a court should not choose among reasonable interpretations of tax policy is that when courts make tax policy they make it only halfway. Courts can decide only who gets the tax preference. We do not make the hard choices about who will make up the difference in taxes, what programs will be cut, or what other taxpayers will have to pay additional taxes to make up for the preferences we have granted.

The majority makes much of Governor Hughes' letter to his State Tax Policy Commission in which he requested that it evaluate proposals for eliminating "taxation of dividends re-

ceived by a parent company from a subsidiary company * * *."
*Ante* at 215. Noticeably missing from the majority's discussion are the considerations of revenue-balancing that underlie the Commission's recommendations. Tax-policy commissions are scrupulous in their presentations to make clear the revenue effects of their recommendations. The 1968 report was in precisely this form. The carefully-worded report of the Commission balanced the revenue gains and losses of its recommendations in these words:

> *Alternative 4:* A fourth alternative would meet the problem on a narrower base but with more substantial relief directed to the problem of corporate headquarters location. *The Commission recommends:*
>
> |  | Million dollars |
> |---|---|
> | A. Include only 50% of subsidiary capital in the net worth base—(after allowing for proportionate debt adjustment)—which would, in effect, reduce the effective tax rate on this form of capital to 1 mill, resulting in an estimated revenue reduction of | $1.5 |
> | B. Eliminate total assets allocation factor from the net worth tax, with estimated revenue reduction of .................. | 1.5 |
> | C. Eliminate from the income tax base intercorporate dividends received from 80% owned subsidiaries, with estimated revenue loss of ........................................ | 4.5 |
> |       Net revenue loss.................................. | $7.5 |
> | D. Increase corporate income tax rate to 3½%, increasing the revenue yield by ........................................ | $7.0 |
> | E. Balance revenue loss from General Fund.............. | 0.5 |
> |       Total revenue replacement........................ | $7.5 |

[Comm'n On State Tax Policy, *Twelfth Report* 47 (1968).] [1]

---

[1] The 1972 report of the New Jersey Tax Policy Committee (the Cahill Commission), which recommended *sweeping changes in State tax laws*, contained a similar item-by-item summary of the precise revenue effects of its combined recommendations. *See* Tax Policy Comm., *Summary: Report of the New Jersey Tax Policy Comm.* 53 (1972).

There is nothing to evidence that the recommendations made by the 1968 Committee contemplated the interpretation of section 54:10A–4(k)(1) today adopted by this Court.

Those who have the primary responsibility for determining the tax policy of the State, the Legislature and the Executive, have apparently consistently viewed the statute in question as not excluding from taxation dividends from indirectly-owned subsidiaries. Yet the effect of the majority decision is to impose a revenue loss through an increase in the dividend exclusion without consideration of what that does to the other side of a delicately-balanced tax equation. Unless the language of the statute clearly dictates otherwise, such decisions are better left to the tax and budgeting experts, not the courts.

The consistent judicial philosophy of this State has been that as judges we should not substitute our judgment in matters of tax policy for the judgments of those delegated the task by legislative design.

> Restraint is particularly essential in tax matters. As the Supreme Court observed in *Ridgefield Park v. Bergen Cty. Bd. of Taxation,* 31 *N.J.* 420, 431 (1960), "[t]he judiciary has no power to devise tax programs or to qualify the existing legislative mandate with a judge's private view of what is just or sensible." This is because of the essentiality of the taxing role in government. [*MacMillan v. Director, supra,* 180 *N.J.Super.* at 178, *aff'd o.b.,* 89 *N.J.* 216.]

In applying these principles of the structure of government to this case, it is at least reasonable to conclude that if the Legislature had intended to exclude from taxation all dividends received from subsidiaries either directly or *indirectly* owned to the extent of 80%, it would have said so expressly. It did not. The Legislature has acquiesced in the Director's long-standing and reasonable construction of the statute to the contrary, and under traditional jurisprudential considerations, we should defer to that construction. *Body-Rite Repair Co., supra,* 89 *N.J.* at 545; *Malone v. Fender,* 80 *N.J.* 129, 137 (1979).

I believe that adherence to the time-tested role of courts in relation to the taxing authority of government will, in the long

run, serve the State better. I would reverse the judgment of the Appellate Division.

*For affirmance*—Justices GARIBALDI, POLLOCK, STEIN and CLIFFORD—4.

*For reversal*—Justices O'HERN and HANDLER—2.