**FLAMINGO FISHING CORP., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 94–82T.**

United States Court of Federal Claims.

Dec. 9, 1994.

See also 31 Fed.Cl. 655.

Daniel D. Levenson, Boston, MA, for plaintiffs. Edward F. Fay, Lourie & Cutler, P.C., of counsel.

David R. House, Washington, DC, with whom was Asst. Atty. Gen., Loretta C. Argrett, for defendant.

## OPINION

MILLER, Judge.*

This case is before the court after trial. The three issues for resolution are 1) whether the payment of small sums—known as "pers," to the cook, mate, and engineer on certain fishing vessels owned by plaintiffs are based on the size of a particular catch, thus qualifying the recipients for the exemption from employment taxes found at section 3121(b)(20), 26 U.S.C. § 3121(b)(20) (1988), of the Internal Revenue Code ("I.R.C."); 2) whether the phrase "normally made up of fewer than ten individuals," also found at I.R.C. § 3121(b)(20), is measured on an annual or quarterly basis; and 3) whether I.R.C. § 3509 applies to the assessments at issue.

At the conclusion of trial on October 13, 1994, the court issued a bench ruling on the first two issues and inquired if either party requested a written opinion. Defendant responded affirmatively. The third issue, a legal issue not addressed at trial, was the subject of post-trial briefing. On August 30, 1994, the court had issued an order on the parties' cross-motions for partial summary judgment. The bench ruling and the order on summary judgment are withdrawn, as this opinion is comprehensive of the earlier bench ruling and order, supersedes them, and is substituted for them. To the extent that any inconsistency exists, this opinion controls.

### BACKGROUND

Flamingo Fishing Corp. ("Flamingo"), Nordic Fisheries, Inc. ("Nordic"), L & H Fishing Corp. ("L & H"), and Pitriz Fishing Co., Inc. ("Pitriz") ("plaintiffs"), are Massa-

---

* Judge Miller was confirmed as Christine Cook Nettesheim.

chusetts corporations with principal places of business in New Bedford, Massachusetts. Plaintiffs are each commercial fishing boat operators in New Bedford. During the years at issue, 1985, 1986, and 1987, Flamingo and Nordic operated vessels called "scallopers," which draw rakes across the ocean floor to harvest scallops. During that same period, L & H and Pitriz operated vessels called "draggers," which drag nets through the water in order to catch fish. This action arises out of a dispute over whether plaintiffs owe employment taxes for certain quarters in 1985, 1986, and 1987. The first and third issues concern all four plaintiffs. The second issue concerns only Flamingo and Nordic.

In 1976 Congress enacted I.R.C. § 3121(b)(20), which created an exemption from employment taxes under the Federal Insurance Contributions Act ("FICA") for small fishing boat operations. I.R.C. § 3121(b)(20) [1] provides, in pertinent part, that the term "employment" does not include

service ... performed by an individual on a boat engaged in catching fish or other forms of aquatic animal life under an arrangement with the owner or operator of such boat pursuant to which—

(A) such individual does not receive any cash remuneration (other than as provided in subparagraph (B)),

(B) such individual receives a share of the boat's (or the boats' in the case of a fishing operation involving more than one boat) catch of fish or other forms of aquatic animal life or a share of the proceeds from the sale of such catch, and

(C) the amount of such individual's share depends on the amount of the boat's (or the boats' in the case of a fishing operation involving more than one boat) catch of fish or other forms of aquatic animal life,

but only if the operating crew of such boat (or each boat from which the individual receives a share in the case of a fishing operation involving more than one boat) is normally made up of fewer than 10 individuals.

The IRS' interpretation of this statute forms the basis of plaintiffs' complaint.

On December 20, 1989, the IRS assessed taxes and penalties against L & H for unpaid employment taxes for certain quarters during 1985–1987. On February 19, 1990, the IRS assessed taxes and penalties against Flamingo and Pitriz for unpaid employment taxes for certain quarters during 1985–1987. On February 19, 1990, the IRS assessed taxes and penalties against Nordic for unpaid employment taxes for certain quarters during 1986–1987. On April 9, 1990, Flamingo made a partial payment of the assessment and filed a claim for refund which the IRS disallowed on May 22, 1990, at Flamingo's request. However, plaintiffs assert that the claim for refund was filed on March 23, 1993, and disallowed on August 13, 1993. On or about April 11, 1990, L & H made a partial payment on the taxes assessed for the period ending June 30, 1985, and Pitriz made a partial payment on the taxes assessed for the period ending September 30, 1985. On or about April 8, 1991, Nordic made a partial payment on the taxes assessed for the period ending September 30, 1987. According to plaintiffs, each has made additional partial payments.

On March 25, 1993, Nordic, L & H, and Pitriz each filed a timely claim for refund for the partial payments made, and on August 13, 1993, the IRS issued a written notice of disallowance for each refund claim. On February 14, 1994, plaintiffs filed suit in the United States Court of Federal Claims, asserting that Flamingo is due a refund of $22.55, plus statutory interest; Nordic is due a refund of $329.91, plus statutory interest; Pitriz is due a refund of $41.65, plus statutory interest; and L & H is due a refund of $175.82, plus statutory interest. Defendant counterclaimed for underpayments.

### FACTS and DISCUSSION

1. *The "per" issue*

Commercial fishermen in New Bedford traditionally have paid their crews by dividing the proceeds of the sale of the catch, sometimes referred to as the "lay," between

---

1. This exception also applies to Federal Unemployment Tax Act ("FUTA") payments and income tax withholding. *See* I.R.C. §§ 3306(c)(18), 3401(a)(17) (1988).

the crew and the boat owner. One practice common to all four plaintiffs is the allocation of a small additional sum of money (the "per"), usually $25.00 or a multiple thereof, to the mate, cook, and engineer. Pers are given to these crew members in recognition of services they perform at sea, in addition to their normal duties.

A collective bargaining agreement between the Teamsters, Chauffeurs, Warehousemen and Helpers, Local No. 59 Fishermen's Division and certain New Bedford boat operators, as revised in 1982, required that pers be allocated according to a sliding scale, or schedule, based on a percentage of the proceeds from the catch.

Plaintiffs first argue that the pers allocated to the mate, cook, and engineer of each boat are derived from the proceeds of the catch, thereby qualifying the recipients for the exemption provided by I.R.C. § 3121(b)(20). Defendant counters that pers are in the nature of a "flat fee" ·and thus constitute remuneration that takes the recipients out of the exemption.

■ Defendant relies on IRS and Treasury interpretations of section 3121(b)(20). In 1977 the IRS issued Rev.Rul. 77–102, 1977 C.B. 299, which describes an example of a fishing boat owner who, out of the gross proceeds from the sale of the catch, allocated $25.00 each to the mate, cook, and engineer. The ruling stated that because the $25.00 payment "does not depend on the amount of the boat's catch of fish, ... the arrangement

fails to meet the requirements of section 3121(b)(20) ... and their remuneration ... is not excepted from wages." Rev.Rul. 77–102. Treas.Reg. § 31.3121(b)(20)–1(a)(1)(i), (iv), promulgated in 1980, provides that service performed by a crew member of a fishing boat with a crew of normally fewer than 10 individuals would be excepted from employment if the crew member's only remuneration was a share of the proceeds from the sale of the catch. It further provided that the amount of the individual's share "depends solely on the amount of the boat's ... catch of fish." Treas.Reg. § 31.3121(b)(20)–1(a)(1)(ii). Plaintiffs respond that Treas.Reg. § 31.3121(b)(20) and Rev.Rul. 77–102 are inconsistent with the statutory language of I.R.C. § 3121(b)(20) and should be declared invalid.[2]

■ An agency regulation should be upheld if the court can conclude that it "implement[s] the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967). In this case the Secretary of the Treasury promulgated Treas.Reg. § 31.3121(b)(20) under his general authority to "prescribe all needful rules and regulations." I.R.C. § 7805(a) (1988). Accordingly, the court owes "the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos. v. United*

---

2. Treas.Reg. § 31.3121(b)(20)–1(a) (1980), provides, in pertinent part, that service performed by an individual on a fishing boat is excepted from employment if:

(i) The individual receives a share of the boat's (or boats' for a fishing operation involving more than one boat) catch of fish or a share of the proceeds from the sale of the catch.

(ii) The amount of the individual's share depends solely on the amount of the boat's (or boats' for a fishing operation involving more than one boat) catch of fish.

(iii) The individual does not receive and is not entitled to receive, any cash remuneration, other than remuneration that is described in subdivision (1) of this subparagraph....

Rev.Rul. 77–102 describes a factual situation involving the application of I.R.C. § 3121(b)(20). It provides, in pertinent part:

The owner of a fishing boat employs a captain and eight other crew members to perform

services on the boat, which is engaged in catching fish. The operating crew of the boat is normally made up of nine individuals. The arrangement provides that the remuneration paid to each of the individuals will be computed as follows: (1) out of the gross proceeds from the sale of the catch deductions are made for ... a payment of $25 each to the mate, engineer, and cook....

Under the arrangement in this situation, the mate, engineer, and cook receive a payment of $25 that does not depend upon the amount of the boat's catch of fish, and, thus, the arrangement fails to meet the requirements of section 3121(b)(20)(C) of the Federal Insurance Contributions Act.

Accordingly, the services performed by the mate, engineer, and cook are not excepted from employment under section 3121(b)(20) of the Act....

*States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2293, 68 L.Ed.2d 814 (1981).

■ In determining the validity of a regulation, the court looks to the "plain language of the statute, its origin, and its purpose." *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979); *see Smith v. Brown,* 35 F.3d 1516, 1522–23 (Fed.Cir.1994) (reversing lower court's interpretation of statute on appeal). Section 3121(b)(20) provides that an individual working on a fishing boat may not receive "*any* cash remuneration (other than ...) a share of the boat's ... catch of fish or ... the proceeds from the sale of such catch, [where] the amount of such individual's share depends on the amount of the boat's ... catch of fish...." (Emphasis added.) This language indicates that the only compensation a crew member may receive is a share of either the catch or the proceeds from the sale of that catch, the amount of which depends on the size of the catch. The statute itself excludes any payment made from the sale of the proceeds of the catch that depends on services performed at sea. Pers that are paid as flat fees therefore are outside the scope of the statute.

Treas.Reg. § 31.3121(b)(20) merely paraphrases the statutory language and requires that a crew member's payment depend solely on the size of the boat's catch. This requirement is no more strict than the statute itself. The regulation is a reasonable interpretation of the statute and must be upheld. Similarly, the interpretation of the statute in Rev. Rul. 77–102 represents a reasonable position. The revenue ruling explained that crewmen who receive flat $25.00 pers for services rendered on each voyage must be considered employees for employment tax purposes because they are receiving cash remuneration that does not depend on the size of the catch. This interpretation does not exceed the bounds of the plain language of the statute. Accordingly, Rev.Rul. 77–102 is not invalid.

■ The remaining issue concerning pers is whether pers paid to the cook, mate, and engineer on vessels owned by plaintiffs during the taxable years at issue, 1985–1987, depended solely on the size of the catch. Plaintiffs contend that the use of a sliding scale, or schedule, in calculating pers supports their argument that the per amount is based on the size of the catch. Evidence adduced at trial, however, undercuts plaintiffs' argument.

First, the schedule itself is not designed to calculate a per based on the size of a particular catch. Rather, this schedule provides a list of predetermined fractions which, when multiplied against a particular dollar value of gross stock, achieves a per amount equivalent, or nearly equivalent, to $25.00. For example, the schedule applies the fraction .41 percent to a gross stock amount of $6,000.00. Multiplying these two variables together renders a per amount of $24.60. The schedule was the product of contract negotiations between certain New Bedford boatowners and the Teamsters Union in 1982. At that time James Costakes was general manager of the Seafood Producers Association, the trade organization that negotiated the contract on behalf of the boatowners. Mr. Costakes testified that the union was concerned with keeping per amounts close to their historical value of $25.00. According to Mr. Costakes, the schedule thus was designed to calculate pers, albeit on a percentage basis. He agreed with defense counsel's characterization that the union's concern was "to maintain the per payments as close to $25 as possible." [3]

Section 3121(b)(20)(C) requires that the amount of an individual's share depends on the amount of the boat's catch. While use of the schedule allows plaintiffs accurately to contend that per payments are based on a percentage of the proceeds of a particular catch, it does not support the contention that per payments are based on the size of a particular catch. The per payments derived from the schedule appear to be in the nature of a flat fee, so they do not satisfy the requirements of I.R.C. § 3121(b)(20). [4]

---

**3.** Roy Enok Enoksen, President of plaintiff Nordic, corroborated this testimony, stating that "a schedule was developed which essentially got you back to approximately $25...."

**4.** Mr. Enoksen testified to plaintiffs' fundamental misunderstanding of the requirement for paying pers in accordance with the statute:

Additionally, ample evidence appears in the record that a number of pers were paid without employing the sliding scale and without purporting to be based on the size of a particular catch. Several witnesses testified about settlement sheets, which record the allocation of proceeds arising out of a particular voyage. Plaintiff Nordic's President, Roy Enok Enoksen, testified with reference to a settlement sheet reflecting a $25.00 per paid to the cook out of the crew's share of the proceeds. This per was in addition to the $24.98 per paid to the cook based on the sliding scale for the same voyage. Mr. Enoksen described this additional flat per as a "[g]ratuity." The settlement sheet also depicts a $100.00 per paid to the mate out of the captain's share. Mr. Enoksen testified that this per was typically given to the mate by the captain "if the mate did a good job." The settlement sheet further reflects that the engineer received a $50.00 per over and above the $24.98 per that he received based on the sliding scale.

Additional flat per amounts are also depicted in a representative settlement sheet for plaintiff Pitriz. These settlement sheets were prepared by witness Kevin Dawson, a member of the accounting firm of Jardin & Dawson, Partners, specializing in marine accounting. Mr. Dawson testified that the per amounts described on the settlement sheet reflect adjustments to the crew's share that were not calculated using the sliding scale. These adjustments to the per amounts, which he characterized as a redistribution of the crew's percentage of the catch, bear no relation to the size of a particular catch and accordingly fall outside the section 3121(b)(20) exception.

> Q Does the payment of a per to a crew member—a mate, cook or engineer—come from any source other than a share of the catch?
> A No. It comes out of the trip.

5. Plaintiffs also argue that the IRS is equitably estopped from disqualifying them from the exception at I.R.C. § 3121(b)(20), because the IRS previously had approved a Form SS-8 application requesting that crew members be treated as self-employed. Gerrit J. VanDissel, an officer, director, and shareholder of Pengall, Inc., the corporate owner of the fishing vessel Rainbow, and not a party to this lawsuit, testified on behalf of plaintiffs. Mr. VanDissel submitted an IRS

Joan Marie Feener, the owner of Marine Services, which performed the settlements for the fishing vessel Edgartown, testified to like effect. In discussing one of Flamingo's settlement sheets, Mrs. Feener, a straightforward witness, testified that the $75.00 payment to the engineer was not based on a sliding scale. Likewise, Cathy Marie Lambert, an employee of Dockside Repairs, which prepared the settlement sheets for the Nordic Pride, testified that various "[e]xtra" pers not based on the sliding scale were paid to the cook, mate, and engineer.

Hans Davidsen, captain of the Edgartown and co-owner of plaintiff Flamingo, testified that per amounts were not always paid out of the proceeds of a catch. Mr. Davidsen stated that, pursuant to a union rule, a per would be paid if a vessel were at sea for more than five days, even though the trip did not produce a catch. In such circumstances pers do not depend on a catch, so they cannot be said to depend on the size of the catch. These pers thus fall outside of section 3121(b)(20).

Accordingly, the per payments to the cook, mate, and engineer do not satisfy the exception in I.R.C. § 3121(b)(20).[5]

### 2. The "normally" issue

■ The second issue tried was whether the word "normally" in I.R.C. § 3121(b)(20) has been defined sufficiently clearly. Section 3121(b)(20) exempts from FICA and FUTA employment taxes fishing vessels when the operating crew normally is made up of fewer than ten individuals. The IRS has admitted that neither the statute nor the regulation explains the meaning of the term and that

Form SS-8 on which he indicated that an individual is paid a share of the catch as per the union contract depending on the boat's catch. Although the IRS Form SS-8 apparently included the pertinent portions of the union contract, including the sliding scale, Mr. VanDissel's characterization of the pers as depending on the catch was inaccurate.

As noted, the sliding scale does not generate a per amount based on the size of a particular catch. Nothing appears in the trial record that supports plaintiffs' argument that the IRS at some point sanctioned the use of the sliding scale in calculating pers.

the word should, if feasible, be read in its ordinary and commonly used sense.

In deciding the meaning of a term in a statute, the court begins with the language of the statute itself. *Commissioner v. Engle*, 464 U.S. 206, 214, 104 S.Ct. 597, 602–03, 78 L.Ed.2d 420 (1984). In this case the word "normally" is susceptible to various interpretations. When a statute is ambiguous, the court must " 'find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " 464 U.S. at 217, 104 S.Ct. at 604 (quoting *NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter J., concurring in part and dissenting in part)). In undertaking this task, the court may look at the statute as a whole as well as the legislative history. *See Engle*, 464 U.S. at 220, 104 S.Ct. at 606. However, the legislative history of section 3121(b)(20) is of little help because it does not define "normally." *See* S.Rep. No. 348, 94th Cong., 2d Sess. 384–86 (1976).

Plaintiffs offer legislation proposed in 1992 as evidence of congressional intent. *See* H.R. 4210, 102d Cong., 2d Sess. § 4662 (1992); H.R. 11, 102d Cong., 1st Sess. § 7705 (1992). H.R. 4210 and H.R. 11 contained provisions that would have amended I.R.C. § 3121(b)(20) to define "normally" as "the average size of the operating crew on trips made during the preceding 4 calendar quarters." Each bill was passed by both houses of Congress, yet was vetoed by President Bush. No indication is evident that the vetoes were related to the provisions at issue.

"[T]he views of subsequent Congresses ... are entitled to significant weight...." in determining congressional intent, especially where the precise intent of the enacting Congress is unclear. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980); *see also Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 118, n. 13, 100 S.Ct. 2051, 2061, n. 13, 64 L.Ed.2d 766 (1980) (noting that subsequent legislation is entitled to more weight in interpreting congressional intent than mere statement in conference report of legislation). Nonetheless, the strength of the proposed 1992 amendment to I.R.C. § 3121(b)(20) is undercut for two reasons. First, it did not become law. Second, Congress made the effective dates of the amendments retroactive to "remuneration paid after December 31, 1984 ... unless the payor treated such remuneration (when paid) as being subject to tax...." H.R. 4210 § 4662; H.R. 11 § 7705. If the 1992 proposed amendments had been intended to clarify the definition of "normally" in the original statute, Congress would have made the amendments retroactive to all taxpayers, not just those taxpayers, like plaintiffs, that did not withhold FICA and FUTA taxes. The proposed legislation had the effect of amending, or changing, the statute instead of merely clarifying it.

The 1992 legislation thus provides some evidence that Congress in 1976 may have intended "normally" to mean the "average size of the operating crew on trips made during the preceding 4 calendar quarters." However, the ambiguity remains unresolved, not only because the legislation ultimately was not enacted into law, but also because it did not have the effect of ascribing to the term "normally" what the lawmakers originally may have intended. Rather, the new law changed the old law only for taxpayers like plaintiffs, thereby leaving the situation of taxpayers who paid taxes under the earlier formulation unaffected.

Defendant contends that the IRS' interpretation of "normally" in General Counsel Memorandum 39,148 (Mar. 1, 1984) ("G.C.M."), is reasonable and must be upheld. Defendant's statement that the definition of "normally" is well known and need not be defined further than the statute is belied by the complex definition of the term in G.C.M. 39,148. The court's duty is to determine if the IRS' interpretation of "normally" in G.C.M. 39,148 implements the congressional mandate in some reasonable manner. *See Texas State Comm'n for the Blind v. United States*, 796 F.2d 400, 406 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). The legislative history indicates that the purpose of I.R.C. § 3121(b)(20) was to ease the burden of cal-

culating, recording, and withholding employment taxes on small fishing boat operations. S.Rep. No. 348 at 385. It remained unclear on summary judgment whether the G.C.M.'s definition of "normally" achieved this goal in a reasonable manner. The court stated that once it received testimony on the boat operators' method of determining crew size at trial, it would be in a better position to resolve the issue.[6]

In earlier proceedings the parties disagreed as to what definition applied as to whether the Nordic Pride and the Edgartown normally sailed with fewer than ten individuals. It became apparent at trial, however, that the parties agree that the term "normally" means "more often than not" as opposed to "average."[7] At trial it was Mr. Enoksen's testimony that normally meant more trips with less than ten a greater proportion of the time. Mr. Davidsen interpreted normally to mean 51 percent or more. The tally of settlement sheets introduced into evidence revealed that on a calendar-year basis the Nordic Pride and the Edgartown sailed with fewer than ten individuals more often than not. Defendant took no exception to this formulation of "normally."

A fundamental question remains regarding whether the tally of crew members for section 3121(b)(20) purposes should be based on a quarter or annual basis. The G.C.M. utilizes the quarterly basis. Plaintiffs, however, contend for the annual basis. The evidence has been viewed in light of the recognized principle of tax law that exemptions are to be construed strictly. *See Temple Univ. v. United States,* 769 F.2d 126, 133 (3d Cir. 1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986). The IRS, in G.C.M. 39,148 has acknowledged that the statutory exemption in section 3121(b)(20) must be interpreted consistent with its legislative intent. *See* S.Rep. No. 348 at 385 (indicating that purpose of I.R.C. § 3121(b)(20) is to reduce burden of calculating employment taxes for small fishing vessels). The G.C.M. notes: "[T]he legislators intended a workable test, one that could be applied by the average boat operator to determine with certainty whether or not the tax in question is payable...."

The court agrees with defendant that in hindsight Nordic and Flamingo could have estimated their respective crew sizes on a quarterly basis. In fact, plaintiff Nordic presented evidence at trial showing the number of trips and crew sizes by quarter. In 1985, for example, only four of 21 trips were crewed by more than nine individuals, and these four trips occurred during the third quarter, a quarter consisting of a total of five trips. Mr. Enoksen conceded on cross-examination that no reason was apparent why one could not look at the trip information on the settlement sheets on a quarterly basis.

Nonetheless, the factual backdrop of this case should not be viewed with the benefit of hindsight, since the approach taken by the boat operators was equally reasonable. Both

---

**6.** The court also reserved for trial the disputed issue of whether plaintiff Flamingo's fishing vessel, the Edgartown, concealed crew members on its settlement sheets. This issue can be resolved neatly through the testimony of Mr. Davidsen and the settlement sheets to which he referred. Mr. Davidsen, captain of the Edgartown and a shareholder in the vessel since 1983, had worked his way up the ladder of a fishing crew. Although nervous, Mr. Davidsen was a sincere, convincing witness who had percipient knowledge of crew size.

With reference to settlement sheets, Mr. Davidsen testified that the crew size was never over ten men and in all cases but one, the crew size was nine or fewer. No evidence of record supports defendant's contention that the Edgartown sailed with between nine and 12 crewmen during 1985–1987. Defendant did not adduce any evidence, testimonial or docu-

mentary, credible or not, that any boat owner or captain who testified concealed or understated the number of crew members who sailed during the period at issue. Plaintiffs introduced consistent, believable, and reasonable evidence that understating crew size would have had such potentially ruinous consequences for purposes of insurance coverage in respect of a liability claim that a strong disincentive existed to understate.

Based on the facts developed at trial, plaintiffs did not understate their crews on settlement sheets. As indicated in the summary judgment ruling, the parties stipulated that the Nordic Pride sailed with a crew of between nine and eleven. Mr. Enoksen's testimony, coupled with documentary evidence admitted at trial, established the same fact.

**7.** The term "average" is one of the definitions relied on by the G.C.M.

Messrs. Enoksen and Davidsen testified plausibly and with self-assurance that they looked at crew size for purposes of the section 3121(b)(20) exemption on a calendar-year basis. Mr. Enoksen explained that the fishermen operated according to the calendar year: "Everything was geared to the calendar year, and that was the logical frame of reference for us to use, we thought." Mr. Davidsen testified that he used a calendar year because "many boats used it...." Although it is undisputed that these plaintiffs paid some taxes on a quarterly basis, the focus is which time frame, quarterly or annually, provided the more workable test, one that could be applied by the average boat operator "with certainty." G.C.M. 39,148. Messrs. Enoksen and Davidsen testified credibly about what was workable to them.

The G.C.M. assumes that the average boat operator considers his operations in the framework of a quarter. This would be true only if the boat operator assumes that a quarterly test should apply. The reasoning is circular. Not every segment of the economy subject to employment taxes is required to view itself on a quarterly basis to see if the activities engaged in or the amount of income earned or paid give rise to withholding obligations for employment tax purposes. For example, plaintiffs cite I.R.C. § 3121(a)(8) (concerning agricultural workers), I.R.C. § 3508(b)(1)(B) (concerning to real estate agents), and I.R.C. § 3401(a) (defining wages) that relate to withholding on a monthly, quarterly, or annual basis for certain covered work. Therefore, the guiding precept of the G.C.M. that the average boat operator should assume a quarterly basis when making its crew count for purposes of tax liability is not justified.

Assuming that the boat operator shares the G.C.M.'s starting assumption and analyzes his activities on a quarterly basis, the test adopted in the G.C.M. requires the following analysis:

[I]f at the time of the first voyage day of a fishing vessel in a calendar quarter the employer has reasonable grounds for knowing that at least half the fishing voyage days in the quarter will be with a crew size of less than 10, then all the voyage days in that quarter will be excepted from FICA and withholding tax.... [Or,] if at the time of such first voyage day the employer has reasonable grounds for knowing that more than half the fishing voyage days in the quarter will be with a crew size of more than 9, then none of the voyage days in that quarter will be so excepted, and for each voyage day in that quarter the crew will not be self-employed for [these] purposes; but ... if at the time of such first voyage day the employer does not have reasonable grounds for knowing whether the crew size of the vessel will be less than 10 for at least half (or more than 9 for over half) of the fishing voyage days in the quarter, then the employer is entitled to rely on the crewmen size of the vessel during the last preceding calendar quarter....

This test does not withstand examination under the standard of workable with certainty by the average boat operator for several reasons. It is complex, a characterization which reaches its full-blown state in the instruction concerning what the average boat owner is supposed to do if a particular voyage begins in a calendar quarter that meets the crew size test, but ends in a quarter that does not meet the test. This instruction belies any notion of certainty in applying the test.

Complexity aside, a key problem is that the average boat operator does not function on the basis of projected estimates of days in a specific time span. The witnesses have testified that they know the length of a typical voyage. At the beginning of a given month or quarter, however, they do not know the exact number of trips that will occur, although the annual rate seems to be predictable. This situation is due to the vagaries of weather, sea conditions, prospects for catching scallops, and other factors unique to the industry.

Historically, according to Mr. Davidsen, spring and summer have better weather and easier working conditions. Because there are more scallops to be caught during these seasons, a fishing expedition would "need a little extra manpower." Mr. Davidsen testified that he determined his crew size based

on the last trip. Mr. Enoksen kept a running tally of crew size throughout the year. He stated: "We were going to make some trips with more [than ten men], but at the end of the year by watching the totals of the trips, we were going to come out with a number that was going to be, you know, less than ten a greater portion of the time."

Defendant responds that the G.C.M. takes account of the fact that the New Bedford boat owners do not predict crew size prospectively on a quarterly basis. The safe harbor provision of the G.C.M. contemplates that a boat operator cannot make such a projection. Defendant argues that, based on the settlement sheet information, the settlement houses or accountants can make the required determinations quarter by quarter based on the preceding quarter's data. Mr. Enoksen testified to this effect. Thus, according to defendant, since the average boat operator uses or has access to accountants, the G.C.M. test can be applied by the average boat operator. The difficulty with this approach is that it nullifies the basic tenant of the G.C.M, which is that the test employed must enable "the average boat operator to determine with certainty whether or not the tax in question is payable."

Of the witnesses who are or were boat operators, Mr. Enoksen, owner of the Nordic Pride, struck the court as apt for the description "average boat owner." He is a life-long fisherman, although better educated than most. He worked his way up the ladder on a vessel and has owned boats for over 25 years. The calculus that he employed to comply with the terms of I.R.C. § 3121(b)(20) is much simpler and more direct than the G.C.M., allows for more certainty to the boat-owner, and is internally consistent.

The G.C.M. states that "normally" should, if feasible, be read in its ordinary and commonly used sense. The calculations that the IRS reads into the time period that it advocates in the G.C.M. do not comport with ordinary or common usage in the fishing industry in New Bedford. Accordingly, the court finds that the IRS determination of "normally" in the G.C.M. does not implement the congressional mandate of I.R.C. § 3121(b)(20) in a reasonable manner.[8]

### 3. *I.R.C. § 3509*

■ Plaintiffs assert that I.R.C. § 3509 (1988), applies in computing their tax liability. Section 3509 provides, in relevant part:

(a) In general.—If any employer fails to deduct and withhold any tax under chapter 24 or subchapter A of chapter 21 with respect to any employee by reason of treating such employee as not being an employee for purposes of such chapter or subchapter, the amount of the employer's liability for—

(1) Withholding taxes.—Tax under chapter 24 for such year with respect to such employee shall be determined as if the amount required to be deducted and withheld were equal to 1.5 percent of the wages (as defined in section 3401) paid to such employee.

(2) Employee social security tax.—Taxes under subchapter A of chapter 21 with respect to such employee shall be determined as if the taxes imposed under such subchapter were 20 percent of the amount imposed under such subchapter without regard to this subparagraph.

Plaintiffs argue that section 3509 applies in that plaintiffs failed to deduct and withhold employment taxes because they treated each of their employees who received pers "as not being" employees. I.R.C. § 3509(a). As evidence of this treatment, plaintiffs note that they failed to deduct and withhold employment tax based upon their mistaken belief that I.R.C. § 3121(b)(20) exempted their crew members from such tax. According to plaintiffs, these crew members were thus treated as "self-employed," or non-employees, and thereby within the ambit of section 3509. Plfs' Br. filed Nov. 10, 1994, at 3.

Plaintiffs' analysis falters for several reasons. The language of I.R.C. § 3509 itself indicates the limited applicability of the pro-

---

**8.** The court's finding that the IRS' determination of "normally" in the G.C.M. does not reasonably implement section 3121(b)(20) supersedes the order filed on August 30, 1994, which held that plaintiff Nordic had received adequate notice of the IRS' interpretation.

vision. The Code provides separate definitions of "wages," "employment," and "employee" for its FICA provisions, yet allows relief only in those situations wherein the employer treated employees, as defined in section 3121(d), as non-employees. I.R.C. § 3121(d)(2) defines the term "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee...." The issue presented, however, concerns whether plaintiffs fall within a narrow exception to the definition of employment found at I.R.C. § 3121(b)(20). As defendant correctly notes, section 3509 facially applies only when an employer fails to deduct and withhold by reason of treating an employee as a non-employee—not when the services of such employee were defined as non-employment under section 3121(b).

Plaintiffs point to the legislative history of section 3509 as evidence that Congress intended to reduce employment tax liability of those employers who mistakenly treated workers as "self-employed." Plfs' Br. filed Nov. 10, 1994, at 1. The legislative history does not aid plaintiffs' interpretation of section 3509. Rather, the Senate Report indicates that the provision was enacted to provide relief in situations wherein the IRS later classified non-employees, such as independent contractors, as employees. The Senate explanation of section 3509 states:

> The committee is aware that the employment status controversies that led to enactment of the interim relief provisions of the Revenue Act of 1978 were aggravated by the serious retroactive tax burdens that may arise when a worker who has been treated as an independent contractor is reclassified as an employee.
>
> ....
>
> Accordingly, the committee bill provides a statutory offset mechanism that will apply in reclassification cases. This provision represents a substantial simplification of present law procedures and will reduce

burdens on employers whose workers were reclassified.

S.Rep. No. 494, 97th Cong., 2d Sess., at 370 (1982). As noted, this case concerns the question whether the services of plaintiffs' employees fall within the narrow exception to employment found at I.R.C. § 3121(b)(20) and does not involve the reclassification of non-employees to employees, as that term is defined at section 3121(d)(2).

Plaintiffs further argue that the IRS itself has recognized that in situations wherein I.R.C. § 3121(b)(20) applies, each employee is considered self-employed, and thus a non-employee, for section 3509 purposes. To support this contention, plaintiffs cite three IRS Tax Guides published during the tax years at issue, specifically to subsections therein titled "Certain Crew Members Considered Self–Employed." *See, e.g., Tax Guide for Commercial Fishermen,* IRS Publ. 595 (Oct. 1985). Each subsection states that "[e]ach member of the crew that meets ... [the conditions of I.R.C. § 3121(b)(20) ] is considered self-employed and not an employee for purposes of social security taxes and federal income tax withholding." *Id.* The next full paragraph, however, contains the following example:

> [T]he mate, the engineer, and the cook get an additional payment from ... [the employer] of $25 each. The payment does not depend upon the boat's catch. Since the mate, the engineer, and the cook get this additional payment that does not depend on the amount of the catch, they are not considered self-employed. The $25 payment and their share of the proceeds from the catch are subject to federal income tax withholding and social security taxes.

Thus, even if I.R.C. § 3121(b)(20) were relevant in determining the employee status of plaintiffs' crew members for section 3509 purposes, it does not aid plaintiffs. The payment of pers, or flat-fees, demonstrates that the mate, engineer, and cook who served on plaintiffs' various fishing vessels were treated as employees.[9] Accordingly, plaintiffs

---

9. Plaintiffs also claim that the IRS recognized that if section 3121(b)(20) applies, each crew member is " 'treated as not being an employee.' " Plfs' Br. filed Nov. 10, 1994, at 2 (quoting I.R.C.

§ 3509). Plaintiffs point to Treas.Reg. § 1.1402(g) which states that "service performed by an individual on a boat engaged in catching fish ... constitutes a trade or business ... if the

cannot avail themselves of section 3509 to calculate the assessments at issue.

## CONCLUSION

Based on the foregoing, the parties shall file a stipulation by January 31, 1995, stating the amount due the IRS from each plaintiff.[10] The Clerk of the Court shall enter judgment consistent with this stipulation for plaintiffs on the "normally" issue, otherwise dismissing the complaint, and for defendant on its counterclaim for unpaid assessments, excluding penalties, on the "pers" issue, otherwise dismissing the counterclaim. The judgment shall note that no costs are awarded.

**IT IS SO ORDERED.**

service is excepted from the definition of employment by section 3121(b)(20) and § 31.3121(b)(20)–1(a)." As noted, section 3121(b)(20) does not bear on plaintiffs' employee status for section 3509 purposes.

10. During the pretrial conference, defendant waived any claim to penalties.